IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

| | | |
|---|---|---|
| ASSOCIATED AVIATION UNDERWRITERS, an unincorporated association, | ) ) ) ) | 2 CA-CV 2003-0091 DEPARTMENT B |
| | ) | O P I N I O N |
| Plaintiff/Appellant/Cross-Appellee, | ) ) | |
| v. | ) ) | |
| THERESA LYNN WOOD, as Personal Representative of CLEDA F. BROWN; MARIA DIMAS CARABALLO; CARL H. FULLER, as Personal Representative of RUTH ANN FULLER; SHARON LOUISE JARDEE;  WALTER E. LEMING, JR.; PETER PAUL LOPEZ; JOSIE G. MONTOYA;  PATRICIA (OBREGON) MORENO; LAURIE ANN NAVARRO; MARY HELEN QUINTANA; FRANCES BERNAL ROSAS; FREDERICK M. SIANEZ; WANDA MAE SOLLIE; SUSAN C. VILLESCAS; FRANCES ESTES; EDWARD LOPEZ; and YVONNE MONTEJANO, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Intervenors/Appellees/Cross-Appellants. | ) ) | |

APPEAL FROM THE SUPERIOR COURT OF PIMA COUNTY

Cause No. 251422

Honorable Robert Buchanan, Judge
Honorable Bernardo Velasco, Judge
Honorable Charles V. Harrington, Judge

Honorable Carmine Cornelio, Judge
AFFIRMED IN PART;
REVERSED IN PART AND REMANDED

---

Gust Rosenfeld, P.L.C.
  By Peter Collins, Jr., Michael S. Woodlock,
and                                                                    Tucson
    Roger W. Frazier                           Attorneys for Plaintiff/Appellant/
                                                                  Cross-Appellee


Baron & Budd, P.C.
  By Frederick M. Baron and                                    Dallas, Texas
    Steven Baughman Jensen


     and


The Gonzales Law Firm                                               Tucson
  By Richard J. Gonzales              Attorneys for Intervenors/Appellees/
                                                              Cross-Appellants

---

P E L A N D E R, Chief Judge.


## TABLE OF CONTENTS

| | |
|---|---|
| INTRODUCTION | ¶¶ 1-4 |
| BACKGROUND | ¶¶ 5-22 |
| DISCUSSION | ¶¶ 23-157 |
|   APPEAL | ¶¶ 23-121 |
|     I. *Morris*-related issues | ¶¶ 23-65 |
|       A. Effect of *Morris* agreement on liability and damage issues | ¶¶ 23-37 |
|       B. The *Smith* decision | ¶¶ 38-41 |
|       C. Conflict of interest issues | ¶¶ 42-47 |
|       D. Other policy considerations | ¶¶ 48-54 |

  E.  Failure to follow pretrial order ¶¶ 55-61
  F.  AAU's challenge to particular Intervenors ¶¶ 62-65

II.  Trigger of insurance coverage ¶¶ 66-99

III.  Reasonableness ¶¶ 100-121
  A.  Background ¶¶ 100-105
  B.  Legal framework ¶¶ 106-109
  C.  Global settlement ¶¶ 110-116
  D.  Evidence of insurance reserves ¶¶ 117-118
  E.  Specific dollar amount ¶¶ 119-120
  F.  Other issues ¶ 121

CROSS-APPEAL ¶¶ 122-157
I.  AAU's occurrence policy and Intervenor
  Montejano ¶¶ 122-123

II.  Intervenors Lopez and Estes ¶¶ 124-125

III.  Intervenors' request for money judgment ¶¶ 126-157
  A.  Procedural background ¶¶ 126-135
  B.  Availability of supplemental relief ¶¶ 136-143
  C.  Continued validity of *Gerardo* judgment ¶¶ 144-154
  D.  Other considerations ¶¶ 155-157

DISPOSITION ¶ 158

¶1     This declarative relief action (DRA) relating to insurance coverage arises from underlying mass-tort actions brought by the seventeen appellees/cross-appellants and approximately 1,600 other individuals (hereinafter, "Intervenors") against Tucson Airport Authority and the City of Tucson (collectively, TAA/City). During the relevant time frame, TAA/City was insured under comprehensive general liability (CGL) policies issued by appellant/cross-appellee Associated Aviation Underwriters (AAU). In the underlying tort actions, AAU defended TAA/City under a reservation of rights. After AAU filed this DRA to contest coverage, Intervenors and TAA/City entered into a settlement agreement pursuant to *United Services Automobile Ass'n v. Morris*, 154 Ariz. 113, 741 P.2d 246 (1987).[1] Pursuant to that agreement, the trial court later entered a stipulated judgment in favor of Intervenors and approximately 1,600 other plaintiffs and against TAA/City in the aggregate sum of almost $35 million.

¶2     In this DRA the trial court ultimately ruled as a matter of law, based primarily on the *Morris* agreement and consent judgment, that AAU's policies in force from 1960 to

---

[1] "[W]e use the term '*Morris* agreement' to describe a settlement agreement entered into when the insurer is defending under a reservation of rights, under which the insured stipulates to a judgment, assigns his rights against the insurer to the claimant, and receives in return a covenant from the claimant not to execute against the insured. An agreement with the same general characteristics entered into when the insurer refuses to defend is referred to as a '*Damron* agreement.'" *Parking Concepts, Inc. v. Tenney*, 207 Ariz. 19, n.1, 83 P.3d 19, 20 n.1 (2004) (citation omitted); *see also Damron v. Sledge*, 105 Ariz. 151, 460 P.2d 997 (1969); *Safeway Ins. Co. v. Guerrero*, 207 Ariz. 82, n.1, 83 P.3d 560, 561 n.1 (App. 2004); *Himes v. Safeway Ins. Co.*, 205 Ariz. 31, n.2, 66 P.3d 74, 77 n.2 (App. 2003).

1969 covered Intervenors' claims against TAA/City in the underlying tort cases. After an evidentiary hearing, the trial court later ruled that the *Morris* agreement was reasonable and confirmed the earlier ruling on coverage. AAU appeals on multiple grounds from the ensuing judgment entered against it and in favor of fourteen trial intervenors in September 2002. Intervenors cross-appeal from various rulings the trial court previously made, and three Intervenors appeal from the trial court's subsequent judgment of March 2003 relating to them.[2]

¶3  On AAU's appeal, we conclude that, to the extent coverage under AAU's policies hinges on an initial determination of liability against the insureds, TAA/City, the *Morris* agreement and consent judgment preclude AAU from litigating what essentially are liability issues in its effort to defeat coverage. In the *Morris* context, liability-related issues are not pertinent to coverage, but rather only to the separate question of whether the *Morris* agreement is reasonable and prudent. Because the trial court essentially proceeded and ruled in that fashion, we affirm its ruling on coverage, including its ruling that Intervenors' "bodily injury, sickness or disease" occurred during the time period of AAU's policies.

---

[2]In their cross-appeal and direct appeal from two separate judgments the trial court entered, Intervenors challenge the trial court's granting of partial summary judgment in favor of AAU and against two of the Intervenors (Edward Lopez and Frances Estes), the court's grant of summary judgment against a third Intervenor, Yvonne Montejano, based on its finding of no coverage under AAU's "occurrence" policies in effect from 1969 to 1972, the court's failing to include a monetary award in its judgment of September 2002, and the court's later failing to do so on Intervenors' motion for reconsideration. For purposes of simplification, we will refer to all such arguments as part of Intervenors' cross-appeal, addressed in ¶¶ 122-57, *infra*.

And, because the court's ruling on the reasonableness of the *Morris* agreement is supported by the record and not contrary to law, we also affirm that ruling.

¶4 On Intervenors' cross-appeal, we conclude that the trial court erred in finding no coverage under AAU's occurrence policy and dismissing Intervenor Yvonne Montejano on that basis, in entering judgment against Intervenors Frances Estes and Edward Lopez, and in declining to grant a money judgment in favor of the fourteen trial intervenors on their motion for supplemental relief in this DRA. We also conclude that the consent judgment entered against TAA/City and in favor of Intervenors has not expired due to their failure to timely renew it under A.R.S. § 12-1551, but rather, that their complaint-in-intervention in this DRA qualified as an action on the underlying judgment pursuant to A.R.S. § 12-1611.

## BACKGROUND

¶5 On appeal from a declaratory judgment, we view the facts and all reasonable inferences therefrom in the light most favorable to upholding the trial court's judgment. *See Polk v. Koerner*, 111 Ariz. 493, 494, 533 P.2d 660, 661 (1975); *Globe Am. Cas. Co. v. Lyons*, 131 Ariz. 337, 340, 641 P.2d 251, 254 (App. 1981). The factual and procedural background of this case is lengthy and complex. The mass-tort litigation underlying this DRA began almost twenty years ago. It involved over 1,600 plaintiffs and concerned complicated facts relating to the use of the chemical trichloroethylene (TCE) in the process of cleaning airplanes in the mid-1940's through the early 1950's and its subsequent contamination of one of Tucson's groundwater aquifers. The following history only

6

attempts to set forth a broad overview of the case while highlighting those matters especially pertinent to the issues raised by the parties and our resolution of them.

¶6        In 1985, Barbara Valenzuela and approximately 1,600 other plaintiffs (again, referred to herein as "Intervenors") sued Hughes Aircraft Company in federal district court. *Valenzuela v. Hughes Aircraft Co.*, No. CIV 85-903-TUC-WDB (D. Ariz.). The plaintiffs alleged they had been injured by exposure to water from an underground aquifer that had been contaminated by TCE that had been used at Hughes's facility. Hughes filed a third-party complaint against TAA/City seeking contribution for any liability that might be imposed against it. After receiving the third-party complaint, TAA/City asked its insurer, AAU, to defend it in the action and indemnify it should it be found liable. AAU agreed to defend TAA/City, but reserved its right to later contest whether its policies covered the plaintiffs' claims.

¶7        In 1986, the *Valenzuela* plaintiffs filed a new action in Pima County Superior Court against TAA/City, alleging that TAA/City was responsible for their injuries because it had contaminated the groundwater aquifer with TCE. *Gerardo v. City of Tucson*, PCSC No. 247622. TAA/City again tendered their defense to AAU, which again agreed to defend its insureds while reserving its rights to later contest its own indemnity obligation under its policies.

¶8        Some background on those policies is appropriate here. Between 1960 and 1972, which the parties agree is the pertinent time frame for this coverage dispute, AAU

insured TAA/City with two different insurance policies commonly known as "accident" and "occurrence" policies. The first policy, in force from October 1, 1960, to August 1, 1969, provided that AAU agreed to pay on TAA/City's behalf

> all sums which the insured shall become obligated to pay by reason of the liability imposed upon him by law, . . . for damages . . . because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person or persons, caused by accident and arising out of such of the hazards defined herein . . . .

The second policy, which was in force from August 1, 1969, to October 1, 1972, contained identical language except, instead of insuring against injuries "caused by accident," covered injuries "caused by an occurrence." The second policy defined "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."

¶9 In May 1988, AAU exercised its reserved right to contest coverage and filed this DRA against TAA/City, seeking a declaration that its policies did not cover the tort claims of the plaintiffs/Intervenors in either *Valenzuela* or *Gerardo*. In February 1989, as this DRA was progressing, the Intervenors offered to settle all their underlying claims against TAA/City. TAA/City notified AAU about the settlement proposal and urged AAU to either pay the settlement demand or attempt to negotiate a settlement more amenable to it. TAA/City also told AAU that if it did not settle or negotiate with Intervenors, they would enter a *Morris* agreement with them. AAU refused to settle or otherwise negotiate with Intervenors.

¶10      After negotiating settlement terms and conditions, Intervenors and TAA/City executed a *Morris* agreement in June 1989. Under the agreement, the parties stipulated to the entry of a judgment against TAA/City in *Gerardo* for $35 million, with TAA/City assigning all its rights to indemnity from AAU for that amount to Intervenors in return for Intervenors' release of all claims against TAA/City and a covenant not to execute on the consent judgment against TAA/City. In May 1990, the federal court in *Valenzuela* approved the agreement. And, in April 1991, the superior court in *Gerardo* entered judgment on the agreement in favor of Intervenors and against TAA/City.[3]

¶11      In August 1989, Intervenors filed a motion seeking to intervene in this DRA and, pursuant to the parties' stipulation, the trial court granted that motion. Intervenors also

---

[3]As far as we can tell, entry of the *Gerardo* judgment was based merely on the stipulation of TAA/City and plaintiffs/Intervenors, without any evidence presented in support of the judgment. In addition, AAU apparently did not seek to intervene in the *Gerardo* case for purposes of contesting and litigating the damage award in that underlying tort case, even though Arizona case law permits, and even prefers, that procedure. *See H.B.H. v. State Farm Fire & Cas. Co.*, 170 Ariz. 324, 330, 823 P.2d 1332, 1338 (App. 1991); *McGough v. Ins. Co. of N. Am.*, 143 Ariz. 26, 691 P.2d 738 (App. 1984); *see also Waddell v. Titan Ins. Co.*, 207 Ariz. 529, n.3, 88 P.3d 1141, 1145 n.3 (App. 2004) (expressing a preference for staying the hearing on damages in the underlying case until the coverage question is resolved).

The *Gerardo* judgment was in the aggregate amount of $34,986,000 and was entered in favor of all plaintiffs whose names were listed on an exhibit to the judgment. That exhibit listed a total of 1,618 plaintiffs and separated them into four categories based on the amount of their recovery ($50,000; $30,000; $20,000; or $13,000). Therefore, we refer in this opinion to either the *Gerardo* judgment or judgments, singular or plural.

filed a "complaint" in which they sought a declaration that AAU's policies covered their claims and that the *Morris* agreement they had reached with TAA/City was reasonable.

¶12      While TAA/City and Intervenors were negotiating and entering into the *Morris* agreement, this DRA was moving forward. In March 1990, the trial court (J. Buchanan) approved a "Case Management Order" in which it ordered that the trial on the DRA would proceed in two phases. Phase I of the litigation would determine "the issues relating to the interpretation of the insurance policies at issue in this lawsuit." Among those issues were "the trigger and scope of coverage," "the applicability of any [policy] exclusions," and a determination of the meaning of certain terms used in the insurance policies. Phase II of the trial would apply the rulings made in phase I and determine, inter alia, the reasonableness of the *Morris* agreement entered into by Intervenors and TAA/City.

¶13      In 1992, AAU moved for summary judgment, arguing its policies did not cover Intervenors' claims against TAA/City because the latter entities could not have been liable for any injuries caused by TCE contamination. AAU based its argument on the general rule that a landlord is not responsible for a tenant's torts committed on leased property, *see, e.g., Gibbons v. Chavez*, 160 Ariz. 73, 75-76, 770 P.2d 377, 379-80 (App. 1988), and on its allegation that any acts that had caused TCE to seep into the aquifer had been committed only by TAA/City's tenants. The trial court (J. Buchanan) apparently accepted AAU's argument and, in granting the motion, ruled that "the insurance policies

10

which are at issue in [this DRA] do not provide coverage for the judgments" in *Gerardo*. Judge Buchanan entered judgment in favor of AAU in March 1993.

¶14       On Intervenors' appeal from that summary judgment, this court reversed. *Smith v. Tucson Airport Auth.*, 180 Ariz. 165, 882 P.2d 1291 (App. 1994). There, we concluded that the issue of whether no coverage existed because of TAA/City's alleged non-liability under landlord/tenant law was "a liability question, not a coverage question," and that the grant of summary judgment had violated *Morris*. *Id.*

¶15       Our supreme court initially granted review of that decision. After oral argument, however, the court concluded "that nonliability-dependent coverage issues are not precluded or foreclosed by the Court of Appeals' opinion." *Smith v. Tucson Airport Auth.*, 183 Ariz. 1, 899 P.2d 162 (1995). Apparently on that basis, the supreme court determined that review had been improvidently granted but ordered that our decision not be published. *Id.*

¶16       Due to collateral issues concerning Environmental Protection Agency claims against TAA/City arising out of these same incidents, this case did not come up on the trial court's calender for several years following our supreme court's denial of review. The only activity that occurred between 1995 and 1998 in this litigation was a change of judge; Judge Velasco replaced Judge Buchanan as the trial judge.

¶17       In July 1998, the trial court (J. Velasco) ordered briefing on the issues to be tried in light of Judge Buchanan's 1990 case management order. In its January 1999 minute

entry, the trial court stated that "the Phase I portion of this cause will require the Intervenors to prove 1) . . . the policy/policies[,] 2) . . . notice and 3) happening of an insured event." The court also stated that during phase II, "[i]f necessary[,] . . . the Intervenors shall have the burden of establishing the settlement was reasonable given the issues affecting liability, defense and coverage." In addition, noting the need "to bring some measure of resolution within a reasonable period of time," the trial court ordered that Intervenors "select by lot a total of 20 intervenors for trial." Six of the twenty intervenors chosen were eventually dismissed from the case, leaving fourteen intervenors for trial.

¶18        In September 2000, after a bench trial held in June and July on phase I, the trial court issued its findings of fact and conclusions of law.[4] The court found that "[t]he events of migration, dispersal and ingestion" of TCE qualified as "accidents" under AAU's accident policies in effect from 1960-1969, but were not "occurrences" under AAU's occurrence policy in effect from 1969-1972. The court also found that "TCE contaminated water was supplied to the homes, schools and workplaces of Intervenors during the entire period of AAU's coverage," and that an individual's first exposure to TCE causes "cellular damage." The court further found that such cellular damage constitutes "bodily injury" under AAU's accident policies and that those injuries occurred during AAU's policy

---

[4]In that phase, Intervenors sought to prove two things: (1) that TCE had entered the groundwater aquifer before 1960 and thus had contaminated Intervenors' drinking water during the policy periods, and (2) that they had been injured upon their first exposure to TCE-contaminated water.

period. Based on those findings, the trial court concluded that AAU's accident policies provided coverage for Intervenors' claims.

¶19        In that same ruling after the phase I trial, the trial court concluded that any inquiry into "the injury aspect contemplated by the policies" was foreclosed by *Morris*, "subject to reasonableness vis à vis the alleged injury and the settlement amount agreed upon." In addition, the trial court expressly *refused* to find the following facts proposed by AAU: "No Intervenor sustained any bodily injury within the meaning of the AAU policies"; "TCE did not cause any bodily injury to any Intervenor during the period of any AAU policy"; and "TCE which emanated from the Airport premises did not cause any bodily injury to any Intervenor during the period of any AAU policy." The trial court refused to find those facts because, according to the court, they were "foreclosed by Morris."

¶20        Sometime after issuing the foregoing phase I minute entry, Judge Velasco left the superior court and Judge Harrington replaced him as trial judge during this DRA's second phase. In April 2002, after an eight-day, phase II trial, the trial court issued additional findings of fact and conclusions of law on "the reasonableness of [the] Morris Agreement." The court ultimately concluded that the global, $35 million settlement was reasonable in fact and amount.

¶21        In September 2002, the trial court entered a "Judgment for the Fourteen Intervenors Under Consideration in Phase Two." In that judgment, the trial court incorporated by reference all findings of fact and conclusions of law in Judge Velasco's

13

September 2000, phase I ruling and its own April 2002 minute entry. The trial court then found that "[i]nsurance coverage exists under one or more of the AAU 'Accident Policies[,'] which provided coverage to the Tucson Airport Authority and the City of Tucson from October 1, 1960 to August 1, 1969, for the claims asserted by the [fourteen] Intervenors," and that the "settlements entered into by the [fourteen] Intervenors were reasonable." The trial court, however, rejected Intervenors' proposed form of judgment that would have included a monetary award.[5]

¶22    After entry of the September 2002 judgment, the case was transferred to Judge Cornelio. Intervenors filed a motion for supplemental relief, a motion for leave to amend their complaint-in-intervention to include a garnishment claim that would relate back to 1989, and a motion to amend the judgment. In denying all three motions, the trial court (J. Cornelio) concluded that (1) Intervenors could not receive supplemental, monetary relief in this DRA, which differs from a garnishment action, and (2) Intervenors could not amend

---

[5]That ruling is one of the subjects of Intervenors' cross-appeal. *See* ¶¶ 126-57, *infra*.

14

their complaint to include a garnishment claim.[6] The court later denied Intervenors' motion for reconsideration of that ruling. This appeal and cross-appeal followed.

## DISCUSSION

## APPEAL

### I. *Morris*-related issues

#### A. Effect of *Morris* agreement on liability and damage issues

¶23 AAU and Intervenors agree that the facts necessary to establish TAA/City's tort liability and those necessary to establish coverage under AAU's policy overlap to a large degree. The parties disagree, however, on the primary issue here: whether and to what extent a *Morris* agreement, related consent judgment between an insured and third-party claimant, and the doctrine of collateral estoppel can prevent an insurer from litigating facts essential to insurance coverage when those facts overlap with those necessary to

---

[6]The trial court also discussed at some length Intervenors' failure to timely renew the *Gerardo* judgment by affidavit. However, the court expressly declined to address or determine "whether the expiration of the Gerardo Judgment has been tolled during the period of this litigation," or "whether the Complaint In Intervention for Declaratory Judgment can serve as a renewal by action pursuant to A.R.S. § 12-1611." Intervenors' cross-appeal includes those issues. *See* ¶¶ 144-54, *infra*. Judge Cornelio also entered a March 2003 judgment that incorporated Judge Velasco's prior summary judgment ruling in favor of AAU and against three of the Intervenors (Edward Lopez, Frances Estes, and Yvonne Montejano). As noted earlier, those Intervenors have appealed from that judgment.

15

establish its insured's underlying tort liability.[7]  That is a legal issue that we review de novo.  *See Garcia v. General Motors Corp.*, 195 Ariz. 510, ¶ 6, 990 P.2d 1069, 1072 (App. 1999) ("We review the availability of collateral estoppel *de novo*.").  Likewise, to the extent this appeal involves interpretation of an insurance contract, our review also is de novo.  *Petrusek v. Farmers Ins. Co.*, 193 Ariz. 552, ¶ 8, 975 P.2d 142, 144 (App. 1998).

**¶24**       AAU asserts that, "even if the coverage facts in the [DRA] are identical and inseparable from those in the underlying tort case," in which the insurer was not a party, "the insurer can litigate them in the coverage case."  AAU contends the trial court (J. Velasco) erred in finding coverage based merely on its application of *Morris* and collateral estoppel.  The finding of coverage was erroneous, AAU argues, because "Intervenors never introduced testimony of a specific causal connection between TCE exposure and any Intervenor's disease, never presented proof of actual injury . . . , and never presented proof of a specific value of any individual claim."[8]

**¶25**       According to AAU, *Morris*'s "true rule" is that,

---

[7]At the outset, we note that neither the *Morris* agreement nor the consent judgment specified the legal basis for TAA/City's liability to Intervenors.  Indeed, the agreement itself states that it is "not an admission of any of the allegations of damage or liability," but rather "a compromise settlement of disputed liability."

[8]Intervenors do not contest those assertions.  Indeed, Intervenors have consistently asserted below and on appeal that the *Morris* agreement establishes those elements, thus relieving them of their burden of proof on those issues.  As Intervenors' counsel bluntly asserted during the phase I trial below:  "[W]e are not going to put on any evidence as to whether there is liability, causation, or damages in the underlying case."

> Whatever may have happened in the tort case between plaintiff and the insured, in which the insurer was not a party, has no effect to establish coverage in a subsequent action against the insurer. . . . In such a case the claimant must prove all the elements of coverage. He must prove an "insured event."

And, AAU argues, "[p]roof of an insured event required proof of (1) an accident, (2) for which TAA would be liable, (3) occurring and producing injury during the policy period." Because Intervenors failed to establish an "insured event," AAU further argues, it is entitled to reversal and a directed judgment in its favor.

¶26 Intervenors' position, of course, is different. They argue the *Morris* agreement and consent judgment established all the elements of TAA/City's legal liability and, accordingly, also established those elements as they pertain to whether AAU's policies covered Intervenors' claims against TAA/City. Intervenors thus maintain the trial court (J. Velasco) was correct when it essentially determined that collateral estoppel bars AAU from litigating liability issues as part of its coverage defense in this DRA. According to Intervenors,

> *Morris* provides that issues essential to an agreed judgment entered in the context of a *Morris* settlement must be given the same binding, collateral estoppel effect as if the judgment in the underlying tort action had been entered after a fully litigated trial—subject only to a judicial determination that the settlement is reasonable and non-collusive.

To not give *Morris* agreements such binding effect, Intervenors argue, "would undercut the entire policy basis underlying the [*Morris*] decision," because "any plaintiff who reaches

17

a *Morris* agreement with a defendant in an underlying tort action must then prove both a coverage case *and* the same underlying tort case in order to have that agreement enforced."

¶27    The starting point for our analysis is *Morris*, inasmuch as both sides agree that case "is controlling and its ruling is clear." There, John Morris filed a tort action against two of United Services Automobile Association's (USAA) insureds, alleging he had been injured by their gross negligence and recklessness. After USAA reserved its right to contest coverage under its policy, its insureds entered into an agreement with Morris whereby they agreed to having a money judgment entered against them, to be collected solely from USAA, in exchange for Morris's promise not to execute against their personal assets. Our supreme court examined two issues on review: (1) whether insureds defended under a reservation of rights can enter into such settlement agreements without breaching their insurance policy's cooperation clause, and (2) if so, the extent to which such agreements bind the insurer in a subsequent coverage dispute. *See* 154 Ariz. at 117, 741 P.2d at 250.

¶28    In first finding settlement agreements between insureds and injured third-party tort claimants valid, the court held

> that the cooperation clause prohibition against [an insured] settling without the insurer's consent forbids an insured from settling only claims for which the insurer unconditionally assumes liability under the policy. Thus, an insured being defended under a reservation of rights may enter into a *Damron* agreement without breaching the cooperation clause. Such agreements must be made fairly, with notice to the insurer, and without fraud or collusion on the insurer. The insurer's reservation of the privilege to deny the duty to pay relinquishes

18

> to the insured control of the litigation, almost as if the insured had objected to being defended under a reservation.

*Id*. at 119, 741 P.2d at 252 (citations omitted).

**¶29** In upholding the validity of *Morris* agreements in this context, however, the court recognized the tension between, on the one hand, giving real meaning and effect to an insured's settlement with a claimant when the insurer has reserved its right to later deny coverage and, on the other, the impulse for the insured to "settle for an inflated amount or capitulate to a frivolous case merely to escape exposure or further annoyance." *Id.* at 120, 741 P.2d at 253; *see also id*. at 118, 741 P.2d at 251 (noting that insureds defended under a reservation of rights are in "a precarious position"). After all, the court noted, "[i]nsureds' settlements often are motivated solely by their strongly-felt need for economic survival and the claimant's desire for a quick judgment that will enable him to get after what he perceives as the real business—collecting from the insurer." *Id*. at 119, 741 P.2d at 252. And, because the insured "may be persuaded to enter into almost any type of agreement or stipulation by which the claimant hopes to bind the insurer by judgment and findings of fact," such agreements pose "a great danger to the insurer." *Id*. at 119-20, 741 P.2d at 252-53; *see also Parking Concepts, Inc. v. Tenney*, 207 Ariz. 19, ¶ 14, 83 P.3d 19, 22 (2004) ("[N]either party to the standard *Morris* agreement has any compelling reason to act reasonably in setting the settlement amount."); *Waddell v. Titan Ins. Co.*, 207 Ariz. 529, ¶ 19, 88 P.3d 1141, 1146 (App. 2004).

19

¶30     To alleviate this tension, the court in *Morris* opted for a "better result" that "permit[s] the insurer to raise the coverage defense, and also permit[s] an insured to protect himself from the risk of noncoverage or excess judgment, while at the same time protecting the insurer from unreasonable agreements between the claimant and the insured." *Morris*, 154 Ariz. at 119, 741 P.2d at 252. In addressing the question of "whether USAA is bound by the settlement agreement or whether it may 'relitigate' any aspect of the original tort claim," the court in *Morris* concluded that "neither the fact nor amount of liability to the claimant is binding on the insurer unless the insured or claimant can show that the settlement was reasonable and prudent." *Id*. at 120, 741 P.2d at 253.

¶31     In reaching that conclusion, the court made several statements on which AAU heavily relies to support its position. For example, the court stated as a fundamental proposition that "[a]n insured's settlement agreement should not be used to obtain coverage that the insured did not purchase." *Id*. More particularly, the court noted that, notwithstanding any unapproved settlement between the claimant and the insured, "the indemnitor may contest its liability." *Id*. Similarly, quoting from *Cay Divers, Inc. v. Raven*, 812 F.2d 866, 870 (3d Cir. 1987), the court in *Morris* recognized that an insured's settlement "does 'nothing to compromise [an insurer's] reserved right to contest coverage.'" 154 Ariz. at 119, 741 P.2d at 252 (alteration in *Morris*). The court also remarked that "any stipulation of facts [in the underlying tort action] essential to establishing coverage would be worthless." *Id*. at 120, 741 P.2d at 253. Applying those principles to the case at hand,

20

the court stated that, "despite the insured's settlement stipulations, the coverage issue is clearly unresolved and USAA may litigate it on remand." *Id.* Accordingly, the court concluded, "the insurer [on remand] is not bound by any factual stipulations and . . . is free to litigate the facts of the coverage defense." *Id.* at 121, 741 P.2d at 254.

¶32    Based primarily on those statements in *Morris*, AAU essentially argues it may fully litigate all liability and damage issues in the coverage phase of this DRA, irrespective of what occurred in the *Gerardo* or *Valenzuela* cases. Thus, AAU contends, neither the *Morris* agreement nor the consent judgment precludes it from avoiding coverage by challenging TAA/City's fault, causation, and Intervenors' alleged damages under the basic insuring provision of its policies. *See* ¶ 8, *supra*. Stated differently, AAU essentially argues that in this DRA Intervenors were required, and failed, to prove liability against TAA/City under landlord/tenant law, a causal relationship between TCE and Intervenors' alleged injuries, and each Intervenors' damages in order to establish coverage under AAU's policies.

¶33    Based on our reading of *Morris*, we reject AAU's argument. Viewed in context, the statements in *Morris* on which AAU relies, *see* ¶ 31, *supra*, are much more limited than AAU asserts and do not support its position. Significantly, the only issue on which USAA's coverage defense in *Morris* was based was whether the insureds had acted intentionally so as to preclude coverage under the policy's intentional act exclusion. *See id.* at 117-18, 741 P.2d at 250-51. USAA had "unequivocally reserved its right to assert

21

the intentional act exclusion as to both [insureds]." *Id.* at 117, 741 P.2d at 250. Thus, the "potential coverage defense" or "coverage issue" in *Morris*, *id.* at 118, 120, 741 P.2d at 251, 253, related solely to that exclusion. Unlike AAU, USAA did not seek to challenge in the coverage case the fact of its insureds' liability. That is to say, the *insureds' liability* in *Morris* could have been premised on either negligent or intentional conduct, but only the former would fall within the policy's coverage. Thus, USAA's coverage defense neither encompassed nor equated to a potential liability defense.

¶34        In short, the court in *Morris* permitted USAA to litigate the "coverage issue" on remand, limiting the scope of that litigation to the facts bearing on the intentional act exclusion. *See id.* at 118, 741 P.2d at 251 (noting USAA's "chance at escaping the obligation to indemnify" by "relitigat[ing] the intentional act exclusion coverage issue in a declaratory judgment action such as this"). Despite the arguably broad, unqualified language in *Morris*, the court did *not* hold that, as part of its coverage defense, USAA could litigate on remand issues having nothing to do with that exclusion, but rather, bearing solely on the insureds' fault, causation, or the plaintiff's damages. *See id.* (differentiating "the insured's liability" from "the coverage defense" in rejecting an approach that would permit "the insurer a double bite at escaping liability"). Indeed, the court expressly rejected USAA's position on that point:

> USAA, however, wants to litigate more than just the coverage issue. Assuming that there was coverage and that [the insureds] did not breach the duty to cooperate, USAA argued to the trial court that the settlement agreement should

22

> not be binding on USAA because it would have won the liability case at trial. USAA urged an absolute right to relitigate all aspects of the liability case, including liability and amount of damages. USAA's absolute position would destroy the purpose served by allowing insureds to enter into *Damron* agreements because claimants would never settle with insureds if they never could receive any benefit.

*Id.* at 120, 741 P.2d at 253. Similarly, AAU's "absolute position" that it should have been allowed to fully litigate liability and damage issues in the phase I coverage trial in this DRA is foreclosed by *Morris*.

¶35 In addition, the procedural posture in *Morris* not only distinguishes that case from this one but also lends much needed context to the court's discussion. The insureds in *Morris* "stipulated that their actions during the shooting incident were *either* negligent or intentional," thereby leaving "the coverage issue . . . clearly unresolved." *Id.* But here, the "coverage" issues AAU seeks to litigate hinge on facts and law bearing directly on the insureds' liability, and those issues *were* completely subsumed in the consent judgment (albeit not actually litigated or determined by a trier of fact) in the underlying tort actions.

¶36 Moreover, the unresolved coverage issue in *Morris* related to the nature or characterization of the insureds' conduct and not to other issues of fault, causation, or damages. Although Intervenors' complaints in *Gerardo* and *Valenzuela* generally alleged, inter alia, intentional misconduct, Intervenors did not pursue that claim. Nor does AAU now contend that the intentional act exclusion in its policies plays any significant role in the coverage defense it seeks to litigate here. Indeed, the trial court (J. Velasco) found no

23

evidence to suggest any intentional wrongdoing on TAA/City's part, and AAU does not challenge that finding.

¶37     In sum, we reject AAU's *Morris*-based argument that Intervenors were required to prove at the phase I trial on coverage any actionable fault on TAA/City's part that caused injury to the Intervenors and that, absent such proof, AAU is entitled to a declaration of "no coverage" under its policies.  Rather, we agree with Intervenors that when an insured who is being defended under a reservation of rights enters into a *Morris* agreement and stipulates to an adverse judgment, the insurer may not litigate in the coverage phase of a DRA "the same legal and factual issues" that underlie the judgment.  Contrary to AAU's argument, *Morris* does not authorize, but rather essentially prohibits, an insurer's attempt in that context to litigate tort liability and damage issues in the guise of a coverage defense.  Accordingly, the trial court did not err in rejecting AAU's evidence and arguments to that effect in the phase I trial.

## B.  The *Smith* decision

¶38     Our conclusions are consistent with this court's previous opinion in this case. In *Smith*, we recognized that when an insured enters into a *Morris* agreement, the insurer "retain[s] the right to contest coverage and to further contest whether the settlement was reasonable and prudent."  180 Ariz. at 166, 882 P.2d at 1292.  But we rejected the insurers' position, taken again by AAU here, "that no coverage existed because TAA and the City were not liable for the actions of their lessees in disposing of TCE."  *Id.*  The issue of

24

"whether TAA and the City were 'legally obligated'" under the terms of the policies, we stated, was "a liability question, not a coverage question." *Id.*

**¶39** Ultimately, this court held in *Smith* that "'liability' under *Morris* includes not only how the trier will view the facts but also how the court will apply the law." *Id.* Consequently, we stated, an insurer whose insured has entered into a *Morris* agreement "is foreclosed . . . [from] claim[ing] that no liability existed in the original case and thus no coverage exists in this [DRA]." *Id.* We noted, however, that in any future hearing on the reasonableness of the *Morris* settlement, the insurers could "attempt to persuade the trier that the settlement was unreasonable in light of the minimal risk of liability being imposed." *Id.* at n.1.

**¶40** As noted in ¶ 15, *supra*, our supreme court ultimately depublished, but did not vacate, this court's opinion in *Smith*.[9] Because that decision remains intact, it represents law of the case. Under the law of the case doctrine, "a court acts within its discretion in 'refusing to reopen questions previously decided in the same case by the same court or a higher appellate court' unless 'an error in the first decision renders it manifestly erroneous or unjust or when a substantial change occurs in essential facts or issues, in evidence, or in the applicable law.'" *State v. Wilson*, 207 Ariz. 12, ¶ 9, 82 P.3d 797, 800 (App. 2004), *quoting Powell-Cerkoney v. TCR-Montana Ranch Joint Venture, II*, 176 Ariz. 275, 278,

---

[9]As our supreme court has stated, depublication orders might be "ambiguous," but they generally signify that the supreme court "disapproved of 'something,'" in the court of appeals' opinion. *Martinez*, 192 Ariz. 176, ¶ 15, 962 P.2d at 906.

279, 860 P.2d 1328, 1331, 1332 (App. 1993). Although the doctrine is a procedural rule rather than a substantive limitation on the court's power, it generally "promotes an orderly process leading to an end to litigation." *Powell-Cerkoney*, 176 Ariz. at 278, 860 P.2d at 1331; *see also Martinez v. Indus. Comm'n*, 192 Ariz. 176, ¶ 14, 962 P.2d 903, 906 (1998).

¶41     Contrary to AAU's assertion, we do not deem *Smith* "manifestly and palpably erroneous." Rather, its central holding, that an insurer in the *Morris* context may not litigate liability issues as a means of avoiding coverage in the DRA, does not undermine *Morris* but rather is consistent with it. And, as far as we can tell, our supreme court did not disagree, noting in this same case that only "non-liability dependent coverage issues" were appropriate for litigation and resolution in a post-*Morris* agreement coverage trial. *See* 183 Ariz. 1, 899 P.2d 162. Though certainly not clear, that language apparently means that purported coverage issues that are either identical to or directly overlap with essential liability questions in the underlying tort case indeed *are* "precluded or foreclosed" in the DRA coverage trial. *See id.* Accordingly, we decline AAU's invitation to overrule or abandon *Smith*. For the reasons explained above, its conclusion is not only sound but is consistent with *Morris*.

## C.  Conflict of interest issues

¶42     Relying primarily on the Restatement of Judgments (Second) § 58 (1982), and *Farmers Insurance Co. v. Vagnozzi*, 138 Ariz. 443, 675 P.2d 703 (1983), AAU also argues

26

conflict of interest principles permitted it to litigate liability and damage issues in phase I of this DRA and required Intervenors to establish coverage by proving actual bodily injuries were sustained and were caused by TAA/City's tortious acts or omissions during AAU's policy period. In essence, Restatement § 58 provides that when an insurer has received proper notice of a claim against its insured and has had an opportunity to defend the insured against the claimant's action, a judgment for the claimant precludes the insurer in a subsequent action for indemnification "from relitigating those issues determined in the action against the [insured] as to which there was no conflict of interest between the [insurer] and the [insured]." Restatement § 58(1)(b). For purposes of that section, "[a] 'conflict of interest' . . . exists when the injured person's claim against the [insured] is such that it could be sustained on different grounds, one of which is within the [insurer's] obligation to indemnify and another of which is not." Restatement § 58(2).

¶43        In *Vagnozzi*, our supreme court applied Restatement § 58 and held that "where there is a conflict of interest between an insured and his insurer, the parties will not be estopped from litigating in a subsequent proceeding those issues as to which there was a conflict of interest, whether or not the insurer defended in the original tort claim." 138 Ariz. at 448, 675 P.2d at 708. Because collateral estoppel principles should be suspended "where there is an adversity of interests" between the insured and insurer, the court ruled, the insurer "was not collaterally estopped [in the DRA] from asserting the policy exclusion for intentional acts." *Id*. And that was so even though "[t]he facts which establish[ed]

27

coverage under the policy for [the claimant's] injury [were] identical to and inseparable from those alleged in the tort action," and even though the claimant had obtained an unopposed, partial summary judgment against the insured finding him negligent in the underlying tort case. *Id.* at 447, 675 P.2d at 707; *see also Morris*, 154 Ariz. at 120, 121, 741 P.2d at 253, 254 (noting that, under *Vagnozzi*, "insurers are not even bound by *litigated* issues as to which there was a conflict of interest" and that insurer on remand was "not bound by any factual stipulations" and was "free to litigate the facts of the coverage defense").

**¶44** Based on Restatement § 58 and *Vagnozzi*, AAU asserts that the very fact that it defended the underlying cases under a reservation of rights, in and of itself, establishes there was a patent conflict of interest between it and TAA/City on all aspects of the underlying tort actions. AAU correctly observes that the attorneys it retained and paid to defend TAA/City in those actions owed a duty of unfettered loyalty and fidelity to TAA/City. *See Paradigm Ins. Co. v. Langerman Law Offices, P.A.*, 200 Ariz. 146, ¶ 16, 24 P.3d 593, 597 (2001); *Vagnozzi*, 138 Ariz. at 448, 675 P.2d at 708. AAU argues that those attorneys were duty-bound to have the tort claims fall within AAU's coverage and, if expedient or advantageous to the insureds, to enter into a *Morris* settlement rather than litigating disputed issues of fault, causation, and damages. Because of defense counsel's obligations to TAA/City in the underlying tort cases and because AAU was not a party to those actions, AAU contends it "los[t] complete control over the defense" of those actions.

28

According to AAU, that "coverage conflict" not only prevented it from forcing litigation of disputed liability and damage issues in the tort actions, but also entitled it "to litigate any fact related to coverage," including those identical issues, in phase I of the DRA.

¶45 We find several flaws in AAU's argument. Like *Morris*, *Vagnozzi* involved a policy's intentional act exclusion and, at a minimum, a factual dispute on whether the insured's act had been intentional. Thus, the entire discussion about conflict of interest in *Vagnozzi*, as in *Morris*, revolved around the insurer's coverage defense, which was based on the intentional act exclusion. *Vagnozzi*, 138 Ariz. at 448, 675 P.2d at 708. The court in neither *Vagnozzi* nor *Morris* suggested, let alone held, that merely defending an insured under a reservation of rights creates a conflict of interest between the insurer and insured on *all* issues and claims in the underlying case, thereby entitling the insurer to litigate all liability and damage issues in a subsequent DRA in an effort to avoid coverage. Thus, neither case authorizes or supports AAU's contention that it may litigate as coverage issues in this DRA "any potential liability" of TAA/City and "[t]he existence of an actual bodily injury" because those matters are "fully intertwined with the coverage issue here."

¶46 Our supreme court recently recognized that "the insurer and insured have valid 'conflicting interests' when a defense is offered with a reservation of rights." *Parking Concepts*, 207 Ariz. 19, ¶ 12, 83 P.3d at 22; *see also Fulton v. Woodford*, 26 Ariz. App. 17, 20, 545 P.2d 979, 982 (1976). But that conflict is not as extensive or all-encompassing as AAU urges. Nor does AAU's broad concept of conflict of interest square with

29

Restatement § 58. In cases such as *Morris* and *Vagnozzi* that involve allegedly intentional acts, "the injured person's claim against the [insured] is such that it could be sustained on different grounds," one of which is within coverage and another of which is not. Restatement § 58(2). That is, regardless of whether the insured's liability arose from negligent or intentional acts, the claimant would be entitled to prevail and recover against the insured on either ground.

¶47 Here, in contrast, Intervenors' original, alternative claim of intentional misconduct by TAA/City was not pursued and is neither at issue nor asserted by AAU as a coverage defense. Absent that claim, AAU has not established that Intervenors' other claims and consent judgment against TAA/City "could be sustained on different grounds," some of which would be covered and others of which would not. Restatement § 58(2). As Intervenors argue, "there were no alternative grounds to sustain a judgment in Intervenors' favor that would be outside the scope of AAU's coverage." Therefore, we agree with Intervenors that issues subsumed in a *Morris* agreement and relating strictly to liability and damages rather than coverage "must be given the same binding, collateral estoppel effect as if the judgment in the underlying tort action had been entered after a fully litigated trial—subject only to a judicial determination that the settlement is reasonable and non-collusive." In other words, as Intervenors also argue, after *Morris*, an insurer that defends its insured under a reservation of rights "risks giving up the opportunity to contest the merits of the underlying tort claim, except in the more-limited context of disputing the

30

reasonableness of a settlement." *See Morris*, 154 Ariz. at 119, 741 P.2d at 252 ("The insurer's reservation of the privilege to deny the duty to pay relinquishes to the insured control of the litigation, almost as if the insured had objected to being defended under a reservation.").

## D. Other policy considerations

¶48 Several additional factors compel us to reject AAU's *Morris*-based argument. First, if an insurer that defends under a reservation of rights may fully litigate in a DRA on coverage all issues relating to liability of its insured (including negligence, causation, and damages), that would largely if not totally defeat the purpose of a *Morris* agreement. If such an insurer could always contest the insured's liability or the claimant's damages in a coverage case, the claimant would have little incentive to enter into a *Morris* agreement. In that situation, any benefit to the insured and claimant would be negligible, a point the court in *Morris* expressly recognized. *Id.* at 120, 741 P.2d at 253 (permitting insurer "to relitigate all aspects of the liability case, including liability and amount of damages[,] . . . would destroy the purpose served by allowing insureds to enter into *Damron* agreements because claimants would never settle with insureds if they never could receive any benefit").

¶49 Second, if an insurer could fully litigate all liability and damage issues in a DRA on coverage, with any indemnity obligation arising only if those issues were resolved adversely to the insurer in that action, a second phase hearing on reasonableness of a

*Morris* settlement would be superfluous. That is, there would be no reason for a trial court to address and evaluate the merits of the underlying claims in determining whether a *Morris* agreement is reasonable if those same issues were previously litigated and resolved in the coverage phase of the DRA, to which the insurer was a party. *Morris* neither contemplates nor permits such a scenario. Rather, the *Morris* court clearly deemed "the facts bearing on the liability and damage aspects of claimant's [underlying] case" as relevant issues for litigation and evaluation in the reasonableness phase, not the coverage phase, of a DRA. *Id.* at 121, 741 P.2d at 254; *see also Waddell*, 207 Ariz. 529, ¶¶ 17, 24, 26, 88 P.3d at 1146-48 (insurer may test reasonableness of *Morris* settlement by presenting evidence on liability, comparative fault, and damages); *Himes v. Safeway Ins. Co.*, 205 Ariz. 31, ¶ 33, 66 P.3d 74, 85 (App. 2003) (insured's liability and claimant's damages relevant in examining reasonableness of settlement). And even in the reasonableness phase, only potential, not actual, liability is at issue. *See Trim v. Clark Equipment Co.*, 274 N.W.2d 33, 37 (Mich. Ct. App. 1978) (reasonableness depends on "the amount paid in settlement of the claim in light of the risk of exposure"); *accord Plumbers Speciality Supply Co. v. Enterprise Prods. Co.*, 632 P.2d 752 (N.M. Ct. App. 1981).

¶50        Third, as Intervenors correctly point out, adoption of AAU's position would upset *Morris*'s "compromise framework," which delicately balanced the various competing interests that arise when an insurer defends an insured under a reservation of rights. As the court stated in *Morris*, "[t]he insurer's reservation of the privilege to deny the duty to pay

relinquishes to the insured control of the litigation, almost as if the insured had objected to being defended under a reservation." 154 Ariz. at 119, 741 P.2d at 252. But under AAU's view, the insured's "control of the litigation" would be meaningless because the insurer would always be able to litigate all liability and damage issues in a DRA on "coverage" if resolution of those issues in the underlying case is not to its liking.[10] Again, *Morris* does not contemplate or countenance that result. For all of the foregoing reasons, we reject AAU's argument that *Morris* supports, let alone compels, the conclusion that "no coverage exists under the AAU policies."

¶51 Although we reject AAU's *Morris*-related argument, we are deeply concerned about *Morris*'s ramifications in a case such as this and disagree with several assertions Intervenors make. For example, Intervenors argue, "[b]ecause [they] needed to prevail on the legal issue regarding landlord-tenant liability and the fact issues of exposure, causation, and injury in the underlying tort litigation in order for the City/TAA to be liable, the existence of the *Morris* agreement precludes their relitigation as coverage issues in this case." According to Intervenors, all such liability and "medical causation" issues "were

_____

[10]At oral argument, AAU argued that even if all liability and damage issues are fully and fairly litigated in the underlying case and ultimately decided in favor of the plaintiff by the trier of fact, an insurer that defended that case under a reservation of rights would still be able to fully contest and litigate those same issues in a DRA on coverage. In our view, neither the law nor logic supports that result. And, as noted earlier, *Morris* specifically rejected USAA's argument for "an absolute right to relitigate all aspects of the liability case, including liability and amount of damages," in a DRA on coverage. 154 Ariz. at 120, 741 P.2d at 253.

33

essential to," and "necessarily resolved" against TAA/City in, the consent judgments entered in *Gerardo* and, therefore, AAU is bound by those determinations. Similarly, Intervenors contend "[n]o conflict exists with respect to the issues of exposure, causation, and injury because those issues were all necessary to Intervenors' underlying tort judgments."

¶52 We find those assertions meritless. They are based on the fiction that liability and damage issues were actually litigated in the underlying tort action and that resolution of those issues in favor of Intervenors was indispensable to the *Gerardo* judgment. On the contrary, however, *Morris* made clear that a consent judgment, such as that entered in *Gerardo*, "'does not purport to be an adjudication on the merits; it only reflects the settlement agreement.'" 154 Ariz. at 120, 741 P.2d at 253, *quoting Miller v. Shugart*, 316 N.W.2d 729, 735 (Minn. 1982). *Morris*'s rule that an insurer is nonetheless bound by the fact of a stipulated judgment is, at least implicitly, based on application of collateral estoppel principles against an insurer, even when material, disputed issues in the underlying case have not been "actually litigated," as the collateral estoppel doctrine otherwise requires. *Campbell v. SZL Props.*, 204 Ariz. 221, ¶ 9, 62 P.3d 966, 968 (App. 2003) (setting forth elements of collateral estoppel). Although the "actually litigated" element is lacking from a consent judgment entered pursuant to a *Morris* agreement, *Morris* permits the insurer to litigate the pertinent liability and damage issues, at least to a limited extent, in the reasonableness trial. *See Waddell*, 207 Ariz. 529, n.4, 88 P.3d 1141, 1148 n.4. In

34

most cases, the insurer's ability to do so represents a fair balance of the insured's and insurer's interests when the insurer has reserved its rights. But when *Morris* is applied in the context of a mass-tort case such as this, that delicate balance might be upset.

¶53      In the mass-tort context, suspension of the "actually litigated" element of collateral estoppel under a *Morris* analysis greatly benefits the insured and claimants but severely hampers the insurer's ability to meaningfully challenge the merits of the underlying claims. Given the nature of mass-tort cases and the voluminous evidence and discovery they engender, the insurer faces a difficult choice. It can challenge the consent judgment's reasonableness by focusing on specific evidence relating to the merits of each claimant's case, a difficult if not impossible task, or it will be left to challenge the settlement only on a more global basis. And, from a practical standpoint, the insurer might well be limited to the latter option when all discovery in a mass-tort case has not, and perhaps cannot, be completed, a consideration that likely factored into the insured's decision to settle in the first place.

¶54      As noted below, *see* ¶¶ 100-121, *infra*, we have no basis for disturbing the trial court's finding that the consent judgment entered pursuant to the *Morris* agreement was reasonable in fact and amount. But we also note that the policy considerations underpinning the *Morris* rule—balancing of the relative equities that exist between insurers and insureds in a typical tort case—are arguably altered in the mass-tort context. As one court has stated, "'mass-exposure toxic-tort cases involve public interests not present in conventional

tort litigation.'" *Owens-Illinois, Inc. v. United Ins. Co.*, 650 A.2d 974, 985 (N.J. 1994), *quoting Ayers v. Township of Jackson*, 525 A.2d 287, 314 (N.J. 1987). Those differing public interests are only compounded when, as here, a court is constrained to resolve a mass-tort case on the basis of insurance law principles. But we cannot deviate from or overrule a decision of our supreme court. *See State v. Smyers*, 207 Ariz. 314, n.4, 86 P.3d 370, 374 n.4 (2004). Therefore, we must apply *Morris*, even when it produces counterintuitive results in a mass-tort case, particularly as to specific individuals.[11]

### E. Failure to follow pretrial order

¶55 AAU's next arguments are largely premised on its misguided interpretation of *Morris*. AAU maintains the trial court (J. Velasco) erroneously failed to follow one of its pretrial orders and thereby allowed Intervenors to obtain a favorable ruling on coverage despite not having proven an "insured event."

¶56 In December 1999, after extensive briefing and argument, the trial court issued a formal pretrial order on the "issues to be tried" in phase I. In that order, the trial court stated that Intervenors had "the burden to prove," inter alia, "the happening of an insured event." The court also stated that, in order to prove an "accident" or "occurrence" under AAU's policies, "Intervenors must establish, by competent, admissible testimony from witnesses," the following:

---

[11]An example of one such individual is intervenor Peter Paul Lopez, discussed in ¶¶ 64-65, *infra*.

a. Facts which prove actions or omissions by TAA/City (or for which they are vicariously liable) constituting an "accident" or "occurrence" at the airport premises, and

b. Facts which prove that the said actions or omissions were negligent, as opposed to intentional, and

c. Facts which prove that TCE emanating from the airport premises entered the regional aquifer and found its way to the workplace, school or home of each Intervenor[.]

¶57 On the issue of the timing of the alleged accidents or occurrences, the court stated Intervenors were required to prove

a. Facts which prove that the said actions and omissions caused TCE to emanate from the airport premises into the aquifer during the policy period of any AAU policy at issue.

b. Facts which prove actual injury caused to each Intervenor from TCE emanating from the airport premises during the policy period of any AAU policy at issue.

¶58 Based on its *Morris* argument, AAU contends the trial court correctly determined in its pretrial order those facts Intervenors had to prove. AAU argues, however, the trial court improperly deviated from the order by "completely changing the standard of proof and completely adopting (without prior notice) Intervenors' approach to the case." By ultimately finding coverage despite not having required Intervenors to show TAA/City's actions actually had caused any injury they allegedly suffered, AAU argues, the trial court impermissibly ignored its own pretrial order.

¶59    To the extent AAU's arguments relate to what Intervenors were required to prove regarding the nature and timing of their injuries, we address them below in our discussion of whether insurance coverage was triggered here. *See* ¶¶ 66-99, *infra*. To the extent AAU argues the trial court erred in failing to require Intervenors to prove that "an act or omission, for which TAA/City was liable, had caused TCE to enter Tucson's water supply," we disagree.

¶60    As discussed at length above, *Morris* prohibits an insurer from litigating in the coverage phase of a DRA legal and factual issues bearing on the insured's liability imposed pursuant to a stipulated judgment. Thus, although Intervenors apparently presented no evidence showing that TAA/City was somehow vicariously responsible for TCE having contaminated the aquifer—an assertion Intervenors do not contest—the trial court did not err in essentially relieving Intervenors of that burden in light of *Morris*.[12] And, under

_____

[12]Portions of the trial court's September 2000 findings of fact and conclusions of law apparently track its pretrial order. For example, the court adopted the following conclusions that AAU had proposed: "[e]ach of AAU's policies . . . require as a condition of coverage, the happening of an accident for which TAA would be liable, producing bodily injury during the policy period"; "[u]nder each of the AAU policies, Intervenors were required to prove, as a condition of coverage, the happening of an insured event"; and "[n]either the [*Morris*] Agreements [sic] nor the judgments entered pursuant to them operate to relieve Intervenors from proving in this case the happening of an insured event, as required by all of the AAU policies." Those conclusions, however, appear to be internally inconsistent with the trial court's determination in that same ruling that no inquiry into "the injury aspect contemplated by the parties" was warranted, "[i]nasmuch as <u>Morris</u> deems the insured accept liability." *See* ¶¶ 19, *supra*, and 69, *infra*. In any event, the trial court's ultimate finding of coverage, based on an accident and cellular damage having occurred during AAU's policy period, is consistent with *Morris*, despite the absence of any proof in the phase I trial of TAA/City's fault, causation, or Intervenors' damages.

*Morris*, the trial court's deviation from the pretrial order was justified because, as Intervenors point out, "the trial court would have committed legal error by permitting the parties to relitigate liability issues in the context of determining coverage." *See* Ariz. R. Civ. P. 16(e), 16 A.R.S., Pt. 1 (pretrial order shall control subsequent course of action but may be modified to prevent manifest injustice); *Carlton v. Emhardt*, 138 Ariz. 353, 355, 674 P.2d 907, 909 (App. 1983) (same); *S. Pac. Co. v. Loden*, 19 Ariz. App. 460, 464, 508 P.2d 347, 351 (1973) (pretrial order controls course of litigation unless modified at trial).

¶61        Moreover, despite the pretrial order, this court's prior decision in *Smith* placed AAU on notice that Intervenors were not required to present evidence on TAA/City's liability in order to establish coverage. *See* ¶¶ 14-15, 38-41, *supra*. In any event, Intervenors consistently maintained below that, regardless of the trial court's order, they did not intend to offer any evidence bearing on TAA/City's liability in the *Valenzuela* or *Gerardo* cases. *See* n.8, *supra*. Therefore, the trial court's pretrial order—to the extent it required Intervenors to prove the elements of TAA/City's fault and causation—neither impacted the phase I trial nor rendered the trial court's ultimate September 2000 ruling on the phase I coverage issues erroneous.[13]

---

[13]The trial court modified the proposed pretrial order by including the following as an issue Intervenors had to prove at phase I: "Whether the alleged acts or omissions of TAA/City (or for which they are vicariously liable) constituted an 'accident' or 'occurrence' which *reasonably and arguably* caused bodily injury to any Intervenor during the policy period of any AAU policy at issue." (Emphasis added.) The court's "reasonably and arguably" standard with respect to phase I makes sense to neither the parties nor this court. But the trial court also deleted from the proposed pretrial order a

39

### F. AAU's challenge to particular Intervenors

**¶62**         AAU next argues the trial court erred in granting judgment in favor of eleven trial Intervenors who alleged only non-cancer illnesses.[14]  AAU bases its argument on the fact that the trial court expressly *refused* to find that "[t]here is competent medical evidence that TCE also causes numerous other non-malignant adverse health consequences in humans, ranging from birth defects to neurological diseases to autoimmune disorders." According to AAU, the so-called "rejection doctrine" renders the trial court's refusal to find that TCE causes non-cancer illnesses an affirmative finding that TCE does not, in fact, cause non-cancer conditions.  AAU asserts that our supreme court adopted that doctrine in *Drum v. Simer*, 68 Ariz. 319, 321, 205 P.2d 592, 593 (1949), in which the court stated that "[a]n omission of the findings to cover a particular fact or issue is to be deemed a finding on that fact or issue against the party having the burden of proof."

---

statement that would have required Intervenors to establish in the phase I trial "[f]acts which prove[d] that such exposure to TCE emanating from the airport premises caused the actual injury to each Intervenor," in order to prove an "accident" or "occurrence."  In any event, despite the court's incomprehensible modification and the apparent inconsistency in the pretrial order, *Morris* and *Smith* relieved Intervenors of any burden of proving TAA/City's fault or causation in the phase I trial as a condition for establishing an "insured event" for coverage purposes.

[14]AAU alludes that "it would be error as well to enter judgment for the 997 Intervenors, not selected for initial Phase Two review, who also did not claim cancer." Those 997 people are not parties to this appeal.  But in any event, and as we note below, *see* n.30, *infra*, AAU has not challenged the trial court's (J. Harrington's) application of its phase I and II rulings to the "non-trial intervenors."  We therefore limit our discussion here to the eleven trial Intervenors who alleged non-cancer illnesses.

¶63 We agree with Intervenors, however, that the rejection doctrine does not apply here because, under *Morris*, Intervenors bore no burden of proof on the issue of *whether* TCE caused their injuries.[15] AAU was precluded from litigating causation issues because they were inextricably intertwined with the issue of TAA/City's tort liability. Thus, as Intervenors also point out, even if the trial court had affirmatively found that TCE does not cause non-cancer illnesses, that determination would be legally irrelevant to the coverage issue of whether AAU had to indemnify TAA/City for its allegedly having caused those illnesses. Because of the legal fiction created by the *Morris* agreement and related consent judgement in *Gerardo*, Intervenors could base their case on the assumption that TCE (for which TAA/City was responsible) caused their injuries—whatever those injuries might have been. As discussed below, the only pertinent coverage issue the *Morris* agreement and consent judgment left open here was the timing of those injuries.

¶64 AAU next argues the trial court erred in granting judgment in favor of intervenor Peter Paul Lopez, who did not claim to have been exposed to TCE inside the area

---

[15]In order to show *when* they were first injured, however, Intervenors presented expert testimony during phase I that an individual suffers cellular damage upon his or her first exposure to TCE-contaminated water. In reaching that conclusion, Intervenors' expert necessarily had to opine that exposure to TCE does, in fact, cause some bodily injury. But, because *Morris* relieved Intervenors of their burden of proof on *whether* TCE had caused their injuries, on that specific aspect of Intervenors' expert's opinion, we express no opinion. For that same reason, as counterintuitive as it might seem, when we discuss whether those cellular injuries triggered insurance coverage, *see* ¶¶ 66-99, *infra*, we only analyze whether substantial evidence supported Intervenors' expert's conclusion on *when* TCE first causes injury.

identified by Intervenors' expert as impacted by TCE emanating from TAA/City property. AAU maintains the trial court was bound to enter judgment against Peter Paul Lopez because it previously had entered summary judgment in favor of AAU on the claims of Edward Lopez and Frances Estes. Those prior rulings, later reduced to judgment in March 2003, were entered in favor of AAU because Edward Lopez did not allege he had been exposed to TCE within the impacted area identified by Intervenors' expert and because Estes had alleged she had been exposed to TCE before AAU's accident policies were in force.[16]

**¶65**        As AAU concedes, however, "application of the Phase I rulings to the individual [claim] of Peter Paul Lopez is not a matter of fact but rather an application of law." And, as discussed earlier, AAU is precluded under *Morris* from litigating the factual issue of *where* particular Intervenors were exposed to TCE. That is essentially a causation issue relating to whether Peter Paul Lopez was exposed to TCE for which TAA/City was responsible. Again, because causation relates to TAA/City's underlying tort liability, AAU is precluded from challenging that issue in the guise of a coverage defense. Accordingly, the trial court did not err in refusing to dismiss Peter Paul Lopez's claim.[17]

---

[16]Edward Lopez and Frances Estes have appealed from the March 2003 judgments entered against them. *See* ¶¶ 124-25, *infra*.

[17]AAU also argues on the same grounds that as to the eleven trial intervenors who alleged only non-cancer illness and Peter Paul Lopez, the trial court (J. Harrington) erred in declining to amend its findings pursuant to Rule 52(b), Ariz. R. Civ. P., 16 A.R.S., Pt. 1, and in denying AAU's motion for new trial made pursuant to Rule 59, Ariz. R. Civ. P.,

## II. Trigger of insurance coverage

¶66       Aside from its *Morris* argument, AAU contends the trial court (J. Velasco) erred in finding, after the phase I trial, that AAU's "accident" policy covered Intervenors' claims.  Both sides agree that the timing of Intervenors' injuries was a genuine coverage issue appropriately litigated during phase I.  The parties disagree, however, on the extent to which Intervenors were required to prove their injuries and what legal rule we should apply to determine whether those injuries triggered AAU's policies.[18]

---

16 A.R.S., Pt. 2.  Because we have concluded that the trial court did not err in the first instance, the trial court did not abuse its discretion in denying those motions.  *See Larsen v. Decker*, 196 Ariz. 239, ¶ 27, 995 P.2d 281, 286 (App. 2000) (denial of motion for new trial reviewed for abuse of discretion).

AAU also claims the trial court should have amended its judgment in favor of Frederick Sianez because, according to AAU, he "alleged no illness, injury or disease caused by any substance."  As with all of AAU's other arguments, however, *whether* Frederick Sianez was injured is an issue AAU is precluded under *Morris* from litigating. Therefore, the trial court did not abuse its discretion in declining to amend its findings or grant a new trial on Frederick Sianez's claims.

[18]AAU's policies do not use the term "trigger."  But we use that term—as other courts and the parties in this case have—out of convenience to denote "the event or events that under the terms of the insurance policy determines whether a policy must respond to a claim in a given set of circumstances."  Robert D. Fram, *End Game: Trigger of Coverage in the Third Decade of CGL Latent Injury Litigation*, *in* 10th Annual Insurance, Excess, and Reinsurance Coverage Disputes, at 9, 12 (PLI Litig. & Admin. Practice Course, Handbook Series No. 454, 1993); *see also Montrose Chemical Corp. v. Admiral Ins. Co.*, 913 P.2d 878, 880 n.2 (Cal. 1995) ("In the *third party* liability insurance context, 'trigger of coverage' has been used by insureds and insurers alike to denote the circumstances that activate the insurer's defense and indemnity obligations under the policy.").

**¶67**     In analyzing this issue, we first focus on the pertinent insurance policy language.  In doing so, we read the policy "'as a whole in order to give a reasonable and harmonious meaning and effect to all of its provisions.'"  *Nichols v. State Farm Fire & Cas. Co.*, 175 Ariz. 354, 356, 857 P.2d 406, 408 (App. 1993), *quoting Droz v. Paul Revere Life Ins. Co.*, 1 Ariz. App. 581, 583, 405 P.2d 833, 835 (1965).  Interpretation of an insurance contract generally involves questions of law, which we review de novo.  *Univ. Mech. Contractors of Ariz., Inc. v. Puritan Ins. Co.*, 150 Ariz. 299, 301, 723 P.2d 648, 650 (1986); *Nat'l Bank of Ariz. v. St. Paul Fire & Marine Ins. Co.*, 193 Ariz. 581, ¶ 12, 975 P.2d 711, 713 (App. 1999).

**¶68**     The principal policy at issue here is AAU's accident policy, which was in effect from October 1, 1960, to August 1, 1969.  Under that policy, AAU agreed "[t]o pay on behalf of the insured all sums which the insured shall become obligated to pay . . . for damages . . . because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person or persons, caused by accident."  The policy specifically applies "only to accidents which occur during the policy period."  But, the policy does not define the terms "bodily injury, sickness or disease," nor does it define the term "accident."  In interpreting an identical policy provision, however, this court has stated:

> No ambiguity is created by the lack of a definition for the term "accident" as used in the quoted [policy-period] provision.  The word "accident," as used in insurance policies, has frequently been defined as "'. . . an undesigned, sudden,

44

and unexpected event, usually of an afflictive or unfortunate character, and often accompanied by a manifestation of force . . .'" As used in this policy, giving to the word the meaning which a [person] of average understanding would, we think it clearly implies a misfortune with concomitant damage to a victim, and not the negligence which eventually results in that misfortune.[19]

*Century Mut. Ins. Co. v. So. Ariz. Aviation, Inc.*, 8 Ariz. App. 384, 386, 446 P.2d 490, 492 (1968) (citations omitted); *see also Outdoor World v. Continental Cas. Co.*, 122 Ariz. 292, 295, 594 P.2d 546, 549 (App. 1979) (noting "the general rule that coverage is determined by the time of the injury or damage"); *cf. Univ. Mech. Contractors*, 150 Ariz. at 302, 723 P.2d at 651 (based on combination of two policy definitions, court found no coverage under one clause of policy because resulting property damage did not occur during policy period).

¶69        In its minute entry issued after the phase I trial, the trial court (J. Velasco) made the following findings relating to whether an "accident" had occurred and the nature and timing of Intervenors' injuries resulting from any accident:

> The events of this case resemble a slow bullet and the image it creates. Things were happening but not at the speed normally contemplated with the discharge of a firearm. The events of migration, dispersal and ingestion [of TCE] in this court's mind [sic] come within the definition of an "accident"

---

[19]Like the policy at issue in *Century Mutual Insurance Co.*, on its face AAU's "accident" policy only requires an "accident," rather than a "bodily injury, sickness or disease," to have occurred during the policy period. Nonetheless, Intervenors do not challenge the proposition that the term "accident" in a CGL policy such as AAU's implicitly includes and requires some resulting injury or damage. Indeed, Intervenors acknowledge that a finding of coverage here hinged on a showing that some bodily injury had occurred or, at least, "*began to develop* during AAU's policy periods."

as contemplated by the policies for 1960-1968. The events do not come within the definition of the terms of the "occurrence" based policies for 1969-1972 and the Insurers are granted a directed verdict as to those policies.

The Court having determined that an accident occurred as contemplated by the 1960-1968 policies, the Court must now consider the injury aspect contemplated by the policies. Inasmuch as <u>Morris</u> deems the insured accept liability the discussion is over, but subject to reasonableness vis a vis the alleged injury and the settlement amount agreed upon. An issue to be decided in Phase II.

. . . .

8.  As a direct and proximate result of th[e] contamination of the regional aquifer from TCE emanating from the Airport, public water supply wells in the area were contaminated with TCE during the entire period of AAU's coverage, from before October 1, 1960 through at least October 1, 1972.

9.  TCE contaminated water was supplied to the homes, schools and workplaces of Intervenors during the entire period of AAU's coverage, from before October 1, 1960 through at least October 1, 1972.[20]

---

[20]Despite this finding, the trial court declined to specifically find Intervenors actually had been exposed to TCE during those periods. Inexplicably, the court stated it had refused to find actual exposure during the policy periods because that issue was "a matter for consideration during the reasonableness hearing phase." To the extent that ruling suggested that the issue was only relevant to reasonableness and not coverage, it was wrong. Indeed, both sides agree that the *Morris* agreement and the resulting *Gerardo* judgments did not and could not establish when Intervenors' alleged injuries had occurred. In any event, as Intervenors point out, "[e]xcept with respect to Intervenors Edward Lopez, Frances Estes, and Peter Paul Lopez, exposure during [the AAU] policy periods is uncontested." AAU does not specifically challenge that assertion but instead argues, as we discuss later, that Intervenors failed to establish coverage because they did not prove "an actual, manifest injury." Therefore, the trial court's refusal to expressly find that Intervenors had actually

10. The adverse health effects to humans that may be caused by exposure to TCE have been extensively studied and are the subject of numerous scientific publications. The International Agency for Research on Cancer, a prestigious rating organization which is part of the World Health Organization, has determined that TCE is a probable human carcinogen. The National Toxicology Program of the U.S. Public Health Service, another important scientific study group, has determined that TCE may reasonably be anticipated to be a human carcinogen.

11. The adverse health effects to humans that are related to TCE exposure are caused by the cellular damage that TCE and its metabolites begin to produce almost immediately upon absorption into the body. Although this cellular damage that begins with exposure may not manifest itself into clinical symptoms or a diagnosable disease for many years following the initial exposure, the first exposure to TCE initiates the biological process that ultimately results in the manifested disease or injury. Each subsequent TCE ingestion contributes to the cumulative adverse health outcome in exposed individuals. Thus, human exposure to TCE causes an actual bodily injury shortly after absorption into the body and the injury continues developing even though it may not yet be clinically manifested by symptoms or capable of being medically diagnosed.

12. The bodily injuries of numerous Intervenors, alleged to be caused by TCE that emanated from the Airport premises, occurred during the period of AAU's coverage from October 1, 1960 to October 1, 1972 inasmuch as Insurers are deemed to admit liability per Morris.

¶70 The trial court then concluded:

---

been exposed to TCE does not affect our decision.

. . . .

2. The acts and/or omissions of TAA and the City as alleged in the *Valenzuela* and *Gerardo* cases and as proven in this case constitute "accidents" which are within the coverage of the AAU policies.

3. The AAU insurance policies at issue in this case are triggered when bodily injury, caused by an accident, is being sustained by an Intervenor during a policy period. "Bodily injury" first occurs when the biological process begins that culminates in manifested injury. Thus, while cellular injuries alone may not be compensable under Arizona law, cellular injuries are sufficient to trigger insurance coverage when there is competent medical evidence, as here, that such injuries initiate the process that culminates in a manifested, compensable bodily injury. To hold otherwise, as AAU suggests, would turn the policies into "claims-made" policies, which they clearly are not.

4. The AAU accident insurance policies at issue in this case provide coverage for the types of claims asserted by the Intervenors exposed to TCE during the AAU accident policy periods.

¶71 AAU challenges both the sufficiency of the evidence and the legal basis for the trial court's finding of coverage. Before addressing AAU's specific arguments, we first recognize several fundamental principles of insurance law that relate to the coverage issue here. First, Intervenors bore the burden of proving coverage under AAU's policies. *See Keggi v. Northbrook Prop. & Cas. Ins. Co.*, 199 Ariz. 43, ¶ 13, 13 P.3d 785, 788 (App. 2000) ("Generally, the insured bears the burden to establish coverage under an insuring clause."); *Pac. Indem. Co. v. Kohlhase*, 9 Ariz. App. 595, 597, 455 P.2d 277, 279 (1969)

48

("When recovery is sought under an insurance contract, the insured has the burden of proving that his loss was due to an insured risk."). Second, as both sides acknowledge, "'the time of the occurrence of an 'accident,' within the meaning of an accident indemnity policy, is not the time the wrongful act was committed but the time [when] the complaining party was actually damaged.'"[21] *Outdoor World*, 122 Ariz. at 295, 594 P.2d at 549, *quoting* C.T. Drechsler, Annotation, *Occurrence of Accident or Injury as During, or Before or After, Time Period of Coverage of Liability Policy*, 57 A.L.R.2d 1385, 1389 (1958) (alteration in *Outdoor World*); *see also Century Mut. Ins. Co.*, 8 Ariz. App. at 385, 446 P.2d at 491. Third, to establish, for coverage purposes, that an "accident" and "concomitant damage" occurred during AAU's policy period, *id.* at 386, 446 P.2d at 492, Intervenors could not merely rest or rely on the *Morris* agreement or consent judgment. *See Morris*, 154 Ariz. at 120, 741 P.2d at 253 ("any stipulation of facts essential to establishing coverage would be worthless").[22]

---

[21]Contrary to that legal principle, the trial court ruled, inter alia, that "[t]he events of migration, dispersal and ingestion [of TCE] in this court's mind come within the definition of an 'accident' as contemplated by the [AAU] policies for 1960-1968" and, apparently on that basis alone, "determined that an accident occurred." As AAU argues, and as Intervenors implicitly concede, that ruling was clearly erroneous. That error is not necessarily fatal, however, because the trial court also found that Intervenors' injuries began to develop upon their first exposure to TCE, which occurred during AAU's policy periods. And we may affirm on any basis supported by the evidence and the law, even if our reasoning differs from the trial court's. *See Univ. Mech. Contractors v. Puritan Ins. Co.*, 150 Ariz. 299, 301, 723 P.2d 648, 650 (1986).

[22]As noted in ¶ 69, *supra*, the trial court found, inter alia, that Intervenors' injuries occurred during the policy period, "inasmuch as Insurers are deemed to admit liability per

49

**¶72** AAU raises two fundamental issues related to the coverage question: (1) whether Intervenors' exposure to TCE caused any type of physical harm during the policy period, and (2) whether any such harm, as a matter of law, constitutes "bodily injury, sickness or disease" under AAU's policy, triggering coverage. The first issue is fact-intensive and turns on whether the record contains substantial evidence to support the trial court's finding that "human exposure to TCE causes an actual bodily injury shortly after absorption into the body and the injury continues developing even though it may not yet be clinically manifested by symptoms or capable of being medically diagnosed." *See* ¶ 69, *supra*. We must uphold the trial court's factual findings unless they are clearly erroneous or lack any substantial evidentiary support, giving "due regard . . . to the opportunity of the trial court to judge the credibility of witnesses." Ariz. R. Civ. P. 52(a), 16 A.R.S., Pt. 1; *see also Brake Masters Sys., Inc. v. Gabbay*, 206 Ariz. 360, ¶ 16, 78 P.3d 1081, 1086 (App. 2003) (factual finding is not clearly erroneous if substantial evidence supports it).

**¶73** AAU contends the trial court erred in finding that an "accident" had occurred during the relevant time frame, triggering coverage under its policies, because "no Intervenor proved that any injury occurred during any AAU policy period." The trial court's finding of coverage under the "accident" policies, AAU argues, was unsupported by "any

Morris." Similarly, the court rejected, "as foreclosed by Morris," AAU's proposed finding of fact that "TCE did not cause any bodily injury to any Intervenor during the period of any AAU policy." The trial court's reliance on *Morris* for those timing-related rulings was error. But the court also found that TCE-exposure causes bodily injury and that such injury occurred during AAU's policy periods. Therefore, we address the propriety of that ruling.

competent, admissible evidence" and "ignored clear, controlling Arizona case law." We disagree.

¶74     In their effort to establish that an "accident" and resulting damage had occurred during the relevant coverage period, as AAU's policies required, Intervenors relied solely on the expert testimony of Marvin Legator, a medical school professor of environmental toxicology. Legator testified that, based on reasonable scientific probability, "TCE metabolizes into chemicals that cause genetic damage." Legator further testified that "TCE is known to cause cancer, and not just in one organ of the body but in many," including kidney cancer, liver cancer, leukemia, lymphomas, "all caused by the same chemical, albeit maybe not the same metabolites." In addressing "the time where the disease processes were initiated that finally led to the disease outcome," Legator stated: "[w]e can unequivocally say that really it's the first drink of water that starts this process rolling." Similarly, Legator testified, "based on reasonable scientific certainty, that the initiation of the processes that lead to adverse health outcomes associated with TCE exposure begin with the very first exposure to the chemical," that is, "[t]he very first drink of water starts the process."

¶75     As Intervenors' counsel pointed out in phase I, the only issue Legator was requested to address was "when did exposures to TCE initiate the processes that resulted in adverse health outcomes or bodily injuries in this case." Accordingly, Legator did not examine any of the Intervenors or their medical records, nor did he "concern [himself] with

whether TCE had caused any problems in this case." Legator openly acknowledged he knew nothing about Intervenors' alleged illnesses, their exposure to TCE, or any causal relationship between such exposure and any claimed diseases because his only assignment "was to talk about TCE exposure and the initiation of processes that can lead to disease outcome." Accordingly, in addressing the timing issue, Legator merely assumed "that individuals had ingested contaminated water from TCE," that "there had been causation," and "that each individual in this case had developed an injury related to exposure to TCE."

¶76 In addition, as AAU correctly points out, at no stage of the proceedings below, including the phase I trial, did any of the Intervenors or their treating physicians testify. Although in their answers to interrogatories Intervenors identified hundreds of physical, mental, or psychological diseases they claimed had been caused by TCE, they presented no evidence at the phase I trial to substantiate those allegations. Nor did Intervenors present any expert testimony that their alleged injuries or diseases were caused by ingestion of water containing TCE.

¶77 Neither those deficiencies nor the qualified, equivocal, and somewhat speculative nature of Legator's testimony precluded a finding of coverage. We must view that testimony in the light most favorable to upholding the trial court's ruling. *See Sabino Town & Country Estates Ass'n v. Carr*, 186 Ariz. 146, 149, 920 P.2d 26, 29 (App. 1996); *see also Standard Chartered PLC v. Price Waterhouse*, 190 Ariz. 6, 45, 945 P.2d 317, 356 (App. 1996) (trier of fact determines credibility and weight of expert testimony). So

52

viewed, his testimony on *when* TCE causes injury constitutes substantial evidence supporting the trial court's finding that, upon an individual's first exposure to TCE, "cellular damage" constituting "an actual bodily injury" occurs.[23]  And, as Intervenors argue, the *Morris* agreement and consent judgment established the elements of compensable bodily injury and its causal relationship to TCE exposure.  Thus, on the legitimate coverage issue of when Intervenors' injuries occurred, we cannot say the trial court clearly erred in finding that human exposure to TCE had caused "cellular damage" during the policy period.

¶78        The second and more difficult question, however, is whether, as a matter of law, such cellular injuries are sufficient to trigger insurance coverage.  Relying primarily on *Transamerica Insurance Co. v. Doe*, 173 Ariz. 112, 840 P.2d 288 (App. 1992), AAU asserts that "mere cellular injury not yet manifested is not a 'bodily injury' for insurance purposes in Arizona."  We review this issue, including interpretation of the phrase "bodily injury" in AAU's policy, de novo.  *See Univ. Mech. Contractors*, 150 Ariz. at 301, 723 P.2d at 650.

---

[23]In addition, based on other experts' testimony in the phase I trial, we find substantial evidence to support the trial court's findings on how and when TCE had seeped into the aquifer.  As to when TCE entered the aquifer, both Intervenors and AAU offered different hydrologists' expert opinion testimony.  Intervenors' expert testified that TCE had contaminated the aquifer starting in the 1950's through the 1980's.  AAU's expert, in contrast, opined that a layer of clay in the soil beneath TAA had prevented TCE from contaminating the aquifer until 1975.  AAU's expert further testified that any TCE that had contaminated the aquifer before 1975 had not originated from TAA premises.

53

¶79 In *Transamerica*, appellants had given emergency medical assistance to victims of a car accident and, in doing so, were exposed to blood infected with the human immunodeficiency virus (HIV), which causes acquired immune deficiency syndrome (AIDS). After a year of testing, however, appellants' blood did not reveal the presence of HIV, and their physician deemed further testing unnecessary. Appellants nonetheless claimed to have sustained bodily injury from their exposure to HIV and sought compensation from their own carrier, Transamerica, under the underinsured motorist (UIM) provision of their automobile liability insurance policy. To recover under the UIM provision of their policy, appellants were required to prove that (1) they were legally entitled to recover in tort from the underinsured driver, because they had sustained (2) bodily injury that was (3) caused by an accident. *Transamerica*, 173 Ariz. 112, 840 P.2d 288.

¶80 Division One of this court first assumed, without deciding, that appellants could have recovered against the negligent driver. *Id*. at 114, 840 P.2d at 290. The court concluded, however, that appellants had not sustained a "bodily injury" for purposes of UIM coverage under their policy. *Id*. at 115, 840 P.2d at 291. Therefore, the court affirmed a summary judgment in favor of Transamerica. In so ruling, the court noted "the term 'bodily injury' . . . is not ambiguous on its face" and stated, "[i]n insurance law, the term 'bodily injury' is narrower and more restrictive than 'personal injury.'" *Id*. The court then defined "bodily injury" as "encompass[ing] only physical injuries, impairment of

54

physical condition, sickness, disease, or substantial pain." *Id.* From that premise, the court concluded appellants' mere exposure to HIV-infected blood was not a compensable bodily injury within the meaning of Transamerica's policy. *Id.*

¶81     In support of its conclusion, the court in *Transamerica* relied solely on *Burns v. Jaquays Mining Corp.*, 156 Ariz. 375, 752 P.2d 28 (App. 1987),  and *DeStories v. City of Phoenix*, 154 Ariz. 604, 744 P.2d 705 (App. 1987).  Those cases held that mere exposure to and inhalation of asbestos particles were not sufficient to support a cause of action in tort.[24]  In finding no compensable "bodily injury" for insurance coverage purposes in *Transamerica*, the court concluded that "[t]he reasoning of *Burns* and *DeStories*" was directly applicable.  173 Ariz. at 115, 840 P.2d at 291. Although neither *Burns* nor *DeStories* involved insurance policy claims, *Transamerica* did.  And, in adopting the reasoning of those two asbestos cases, the court in *Transamerica* concluded:

---

[24]Expert testimony presented in *Burns* established not only that plaintiffs had been "exposed to substantial and cumulative quantities of asbestos fiber," but also "all ha[d] asbestos fibers in their lungs which are causing changes in the lung tissue."  156 Ariz. at 377, 752 P.2d at 30.  As this court noted:  "Sooner or later some of the residents, if they live long enough, will suffer from asbestosis and other asbestos-related diseases."  *Id.* Nonetheless, this court ruled that "'subclinical injury resulting from exposure to asbestos is insufficient to constitute the actual loss or damage to a plaintiff's interest required to sustain a cause of action under generally applicable principles of tort law.'"  *Id.*, *quoting Schweitzer v. Consol. Rail Corp.*, 758 F.2d 936, 942 (3d Cir. 1985).  Accordingly, we concluded that "[t]here can be no claim for damages for the fear of contracting asbestos-related diseases in the future without the manifestation of a bodily injury."  *Id.* at 378, 752 P.2d at 31; *see also DeStories*, 154 Ariz. at 607, 744 P.2d at 708 (no "compensable physical harm" to support tort action when "plaintiffs offered evidence establishing, at most, that they had been exposed to asbestos dust and therefore had an 'increased probability' or 'significantly increased risk' of developing a fatal lung disease").

These appellants, like the plaintiffs in *Burns* and *DeStories*, offer "no competent evidence of any physical impairment or harm caused by this exposure." *Burns*, 156 Ariz. at 377, 752 P.2d at 30. Appellants therefore have not sustained any compensable bodily injury within the meaning of the Transamerica policy as a result of their exposure to the passenger's infected blood, as they have suffered no physical injury, sickness, disease, or substantial pain as a direct result of exposure to the virus.

173 Ariz. at 115, 840 P.2d at 291.

¶82 Relying on *Transamerica*, *Burns*, and *DeStories*, AAU contends "no Intervenor proved an actual injury, as defined by Arizona law" for insurance coverage purposes.[25] If the issue in phase I had been whether Intervenors in fact had sustained manifested, compensable bodily injuries caused by exposure to TCE, those three cases indeed would support AAU's position. AAU's entire argument, however, overlooks the *Morris*-agreement context of this case and the limited coverage issue presented in phase I: the timing of the accident that caused any injuries.[26] Understandably, AAU has persistently challenged and attempted to litigate whether Intervenors in fact sustained any manifested,

---

[25]We note that, although the trial court did not expressly cite or address *Transamerica*, it apparently sought to distinguish that case, stating "while cellular injuries alone may not be compensable under Arizona law, cellular injuries are sufficient to trigger insurance coverage when there is competent medical evidence, as here, that such injuries initiate the process that culminates in a manifested, compensable bodily injury."

[26]Although AAU contends Intervenors should have been required in the phase I trial to prove their injuries and causation, they acknowledge that the pivotal coverage issue actually tried in that phase was "**when** the injuries occurred."

compensable injuries and, if so, whether TCE-contaminated water proximately caused any such injuries. But, as the trial court noted, *Morris* forecloses those arguments.

¶83        The central issue in *Transamerica*, *Burns*, and *DeStories* was whether the claimants had sustained a manifested, compensable injury. Intervenors maintain that *Transamerica* "never purported to determine what events would trigger insurance coverage in the context of claims of latent disease arising from toxic exposures years earlier," insisting it "has no application to this case." Similarly, Intervenors argue, "*Transamerica* is inapposite to the trigger question before this Court because here, unlike in *Transamerica*, Intervenors have manifested 'compensable physical injuries' that supported their underlying tort claims."

¶84        We agree with Intervenors' ultimate position but not necessarily their reasoning. It is certainly debatable whether this record reflects that Intervenors actually "have manifested 'compensable physical injuries,'" as they assert. But here, unlike the situation in *Transamerica* or the asbestos cases, the fact that Intervenors sustained compensable injuries or actual loss adequate to support a cause of action is deemed established by the *Morris* agreement and consent judgment. *See* ¶ 77, *supra.* Thus, the determinative question in those cases was simply not at issue here.

¶85        In our view, *Transamerica* would resolve the issue presented here if the court had addressed whether appellants' exposure to the HIV-tainted blood at the accident scene constituted a "'bodily injury . . . caused by an accident'" under circumstances in which

appellants *had actually tested positive for HIV*, but had not yet manifested any signs or symptoms of AIDS until after the policy period. 173 Ariz. at 114, 840 P.2d at 290. Although the court in *Transamerica* had no need to address that hypothetical issue, language at the end of its opinion relating to the statute of limitations provides some guidance here. In discussing the issue of when the limitations period would begin to run "should appellants [eventually] sustain bodily injury as a result of exposure to the infected blood," the court suggested that, in that event, appellants could then "refile their action" against Transamerica. *Id.* at 116, 840 P.2d at 292.

¶86        Thus, the court implied that Transamerica's policy (in effect at the time of appellants' exposure), rather than whatever policy might be in effect when appellants ultimately develop a manifested, "compensable bodily injury," *id.* at 115, 840 P.2d at 291, would provide coverage for the future claim. Similarly, inasmuch as Intervenors' injuries are deemed established under *Morris*, AAU's policy covers Intervenors' claims because it was in effect at the time of initial exposure and resulting "cellular injury." In sum,

because neither *Transamerica* nor the asbestos cases involved a *Morris* agreement or any timing-of-injury issue such as that posed here, we find those cases inapposite.[27]

¶87     Because the context and specific issue involved in this case differ from *Transamerica*, we are faced with the following issue of first impression in Arizona: does exposure to a toxic substance, cellular damage resulting therefrom, and the biological processes initiated by such damage constitute a "bodily injury, sickness or disease" such that coverage is triggered under a CGL insurance policy? Resolution of this issue poses, to say the least, difficult legal problems. As the New Jersey supreme court stated:

> Our concepts of legal causation were developed in an age of Newtonian physics, not of molecular biology. Were it possible to know when a toxic substance clicks on a switch that alters irrevocably the composition of the body and before which no [bodily injury has taken place,] we might be more confident that [accident]-caus[ed] damages had taken place during a particular policy period. The limitations of science in that respect only compound the limitations of law. [In other words, m]ass-exposure toxic tort cases have simply exceeded the capacity of conventional models of judicial response.

*Owens-Illinois*, 650 A.2d at 985 (citation omitted). More bluntly, one federal court faced with this issue has called it an "impossible problem" with "no truly satisfactory solution,"

_____

[27]We also note that, in *Burns*, this court found that mere "'subclinical injury resulting from exposure to asbestos'" could not support a tort claim, but acknowledged that "the existence of such injury may be of vital concern to insurers and their insureds who have bargained for liability coverage triggered by 'bodily injury.'" 156 Ariz. at 377, 752 P.2d at 30, *quoting Schweitzer*, 758 F.2d at 942; *see also Ins. Co. of N. Am. v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212, 1223 (6th Cir. 1980) ("There exists a clear distinction between when bodily injury occurs and when the bodily injury which has occurred becomes compensable.").

because each possible solution "has its flaws and anomalies." *Ins. Co. of N. Am. v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212, 1226 (6th Cir. 1980).

¶88        In the context of toxic-exposure cases, courts have developed three primary theories for determining what events will trigger insurance coverage: the manifestation theory, the exposure theory, and the continuous (or triple) trigger theory. The manifestation theory is distinctly a minority view, having been adopted by only one court in the personal injury context. *See Eagle-Picher Indus., Inc. v. Liberty Mut. Ins. Co.*, 682 F.2d 12 (1st Cir. 1982). Under that theory, "bodily injury" occurs and coverage is therefore triggered *only* when a disease becomes clinically identifiable or diagnosable. In essence, progressive diseases caused by exposure to toxic agents are treated the same as injuries that occur immediately or very close in time to the causative event. The manifestation theory therefore requires that diseases be fully developed during the policy period before a policy is deemed to provide coverage. Based primarily on *Transamerica*, AAU contends Arizona is committed to requiring "manifested injury for recovery" in a case such as this. But, as noted above, we do not find *Transamerica* controlling here.

¶89        Under the so-called exposure theory, coverage is triggered when an individual is exposed to a toxic substance during the policy period and some cellular injury results. The manifestation of disease under that theory is not a discrete, triggering event. Rather, the ultimate manifestation of disease is merely a consequence of the initial injury of exposure to a toxic substance that initiates the disease process. *See Forty-Eight*

*Insulations*, 633 F.2d at 1222-23; *accord Porter v. Am. Optical Corp.*, 641 F.2d 1128 (5th Cir. 1981); *see also Hancock Labs., Inc. v. Admiral Ins. Co.*, 777 F.2d 520 (9th Cir. 1985) (applying California law, court employs exposure theory); *Guar. Nat'l Ins. Co. v. Azrock Indus.*, 211 F.3d 239 (5th Cir. 2000) (applying Texas law, court employs exposure theory).

¶90        Under a continuous-trigger theory, the initial exposure to a toxic agent, "exposure-in-residence," and disease manifestation all constitute "bodily injuries" under an insurance policy. *Keene Corp. v. Ins. Co.*, 667 F.2d 1034 (D.C. Cir. 1981). Exposure-in-residence is the period between the initial exposure and the time when the injury manifests itself. *Guar. Nat'l*, 211 F.3d at 245. In other words, coverage is triggered if an individual shows he or she was exposed to a toxic substance, was diagnosed or developed identifiable symptoms, *or* has yet to develop identifiable symptoms but was in fact exposed at an earlier time. Any one of those events is considered part of the single injurious process caused by toxic exposure, and all policies in effect when any one of those events occurs apply and provide coverage. According to the California Supreme Court, "most courts" that have analyzed the trigger-of-coverage issue have adopted a continuous trigger theory. *Montrose Chem. Corp. v. Admiral Ins. Co.*, 913 P.2d 878, 896 (Cal. 1995); *see also* Robert D. Fram, *End Game: Trigger of Coverage in the Third Decade of CGL Latent Injury Litigation*, *in* 10th Annual Insurance, Excess, and Reinsurance Coverage Disputes, at 15 (PLI Litig. &

Admin. Practice Course, Handbook Series No. 454, 1993) (stating that the "so-called continuous trigger theory has gained wide acceptance by the courts").[28]

¶91 In determining which theory should apply here, we start with the policy language, focusing on whether Intervenors' cellular injuries constitute "bodily injury" under AAU's policy so as to trigger coverage. Arizona courts attempt to "'honor the drafting intent and the plain meaning of the policy language.'" *Ohio Cas. Ins. Co. v. Henderson*, 189 Ariz. 184, 186, 939 P.2d 1337, 1339 (1997), *quoting* Kirk A. Pasich, Commentary, *The "Expected or Intended" Exclusion and California Insurance Code Section 533*, 10 No. 21 Mealey's Litig. Rep.: Insurance 20, 31 (1996). That approach requires a court interpreting an insurance contract to first "construe provisions of an insurance policy according to their plain and ordinary meaning," if possible. *Liristis v. Am. Family Mut. Ins. Co.*, 204 Ariz. 140, ¶ 13, 61 P.3d 22, 25 (App. 2002).

¶92 As noted earlier, the court in *Transamerica* found the term, "bodily injury," unambiguous "on its face" and defined the term as including "physical injuries, impairment

---

[28]*See also Young Women's Christian Ass'n v. Allstate Ins. Co.*, 275 F.3d 1145 (D.C. Cir. 2002); *AC & S, Inc. v. Aetna Cas. & Sur. Co.*, 764 F.2d 968 (3d Cir. 1985); *Hirschberg v. Lumbermens Mut. Cas. Co.*, 798 F. Supp. 600 (N.D. Cal. 1992); *Broderick Inv. Co. v. Hartford Accident & Indem. Co.*, 742 F. Supp. 571 (D. Colo. 1989), *rev'd on other grounds*, 954 F.2d 601 (10th Cir. 1992); *New Castle County v. Cont'l Cas. Co.*, 725 F. Supp. 800 (D. Del. 1989), *aff'd in part, rev'd in part on other grounds*, 933 F.2d 1162 (3d Cir. 1991); *Lac D'Amainte du Quebec, Ltee. v. Am. Home Assurance Co.*, 613 F. Supp. 1549 (D. N.J. 1985); *Eli Lilly & Co. v. Home Ins. Co.*, 482 N.E.2d 467 (Ind. 1985); *Gottlieb v. Newark Ins. Co.*, 570 A.2d 443 (N.J. Super. Ct. App. Div. 1990); *Wis. Elec. Power Co. v. Cal. Union Ins. Co.*, 419 N.W.2d 255 (Wis. Ct. App. 1987).

of physical condition, sickness, disease, or substantial pain." 173 Ariz. at 115, 840 P.2d at 291. Assuming that definition applies here, interpretation of policy language cannot be divorced from the particular facts of the case. *See Mayor of Baltimore v. Utica Mut. Ins. Co.*, 802 A.2d 1070, 1095 (Md. Ct. Spec. App. 2002) ("[I]n the final analysis[, a] court must apply policy language in particular factual contexts."); *Montrose*, 913 P.2d at 888 (proper resolution of trigger of coverage issue depends on nature of underlying facts).

¶93        Neither the context of this case nor the wording of AAU's policy supports application of the manifestation theory here. AAU's policy does not clearly provide that only fully manifested disease will trigger coverage. Rather, apparently unlike the UIM provision at issue in *Transamerica*, AAU's policy states, in the disjunctive, that it covers liability for "bodily injury," "sickness," or "disease." Those distinctions are significant because "bodily injury" presumably means something other than "disease." *See Gfeller v. Scottsdale Vista N. Townhomes Ass'n*, 193 Ariz. 52, ¶ 13, 969 P.2d 658, 660 (App. 1998) (we are required to interpret a contract in a way that all of its terms are given meaning and none is rendered superfluous). And, as "understood by the layman," a "disease" implies "a condition which either has impaired, or presumably will impair, *if it continues in its usual course of progress*, the normal working of some of the bodily or mental functions." *Dickerson v. Hartford Accident & Indem. Co.*, 56 Ariz. 70, 76, 105 P.2d 517, 520 (1940).

¶94        The trial court did not find, nor does the record reflect, that Intervenors had

sustained any actual "disease" during AAU's policy period.[29] But a "disease" is only one

subset of the broader category of "bodily injury," which includes any "physical injuries."

*Transamerica*, 173 Ariz. at 115, 840 P.2d at 291. Based on its plain and ordinary meaning,

*see Liristis*, 204 Ariz. 140, ¶ 13, 61 P.2d at 25, the term, "bodily injury," in this context is

not limited to a fully manifested, diagnosable condition. *See Forty-Eight Insulations*, 633

F.2d at 1222, *quoting* Appleman, *Insurance Law & Practices* § 355 (1965) ("[F]or

insurance purposes, courts have long defined the term 'bodily injury' to mean 'any localized

abnormal condition of the living body.'"). Accordingly, in order to give "effect to all of [the

policy] provisions," *Nichols*, 175 Ariz. at 356, 857 P.2d at 408, and considering the

disjunctive language AAU used and the lack of any definition in the policy of the phrase,

"bodily injury," we reject the manifestation theory in this case. As noted above, AAU's

reliance on *Transamerica* for a contrary conclusion is misplaced. And, as also noted

above, the manifestation theory is incompatible with the court's suggestion in that case that

Transamerica's UIM coverage would apply if appellants were to ultimately sustain a bodily

injury from their previous exposure to HIV-infected blood. *See* ¶¶ 85-86, *supra*.

---

[29]Although Legator described a process of "cellular damage" initiated by TCE exposure, the process as explained by him does not fall within the accepted definition of "disease," nor did Legator equate the process with a full-blown, manifested disease that is clinically identifiable or diagnosable. *See Eagle-Picher Indus.*, 682 F.2d 12. In addition, Legator testified that the chances of someone developing cancer from TCE exposure depended largely on "chance" and on the extent of one's exposure, a topic he did not address in this case.

¶95    Much of the same reasoning requires us to also reject the exposure theory. Under that theory, we would be required to interpret "bodily injury" to mean *only* the exposure to a toxic substance and the cellular damage resulting therefrom and to find such injury to be the sole trigger of coverage. But then we would be, at best, equating "disease" with "bodily injury" or, at worst, excising the term "disease" from the policy. Neither result is supportable. "Every disease is presumably preceded by the onset of sub-clinical changes in the body[, t]o state that . . . disease occurs when these sub-clinical alterations take place . . . is to subvert the plain meaning of 'disease' and to read the term entirely out of the policy." *Eagle-Picher*, 682 F.2d at 19-20 (rejecting exposure theory in context of adopting manifestation theory). As the court in *Keene* stated:

> If exposure . . . were deemed to constitute discrete injury and thereby trigger coverage, . . . the subsequent development of a disease would be characterized best as a consequence of the injury. Future stages of development would not constitute new injuries and therefore would not trigger additional coverage. Under that interpretation, [an insured] who bought a comprehensive general liability policy would not bear the risk of liability for diseases that occurred due to exposure during a covered period. It would, however, bear the risk of liability for diseases that manifest themselves during the covered period, but that occur because of exposure at a time when the [insured] held no insurance. As a result, the [insured's] purchase of insurance would *not* constitute a purchase of certainty with respect to . . . diseases [caused by toxic exposure]. The insured would remain uncertain as to future liability for injuries whose development began prior to the purchase of insurance. There is no indication that such a de facto exclusion of coverage from the policies was in the contemplation of any party to the contracts in this case. . . . A latent injury, unknown and unknowable to [the insured] at the

time it purchased insurance, must, at least, be covered by an insurer on the risk at the time it manifests itself.

667 F.2d at 1044 (footnotes omitted). In short, we cannot adopt the exposure theory here.

¶96 In our view, based on the policy language, "selecting one or another of the phases [of disease] as the exclusive trigger of liability" is inappropriate. *J.H. France Refractories Co. v. Allstate Ins. Co.*, 626 A.2d 502, 507 (Pa. 1993). Instead, under the particular facts of this case, we interpret "bodily injury" to include the cellular damage caused by TCE exposure *and*, even after exposure has ceased, the continuing injurious process initiated thereby. In other words, both exposure and exposure-in-residence occurring during the policy period will trigger insurance coverage. In addition, the policy clearly is also triggered if "disease" manifests itself during the policy period. *See Keene*, 667 F.2d at 1047.

¶97 Sound social policy supports this conclusion as well. Defining "bodily injury" as any stage of the disease process guarantees all possible injured victims will receive compensation and, in cases involving multiple insurance policies, spreads the risk to the largest possible group of policyholders or claimants. *See Ohio Cas.*, 189 Ariz. at 190, 939 Ariz. at 1343. Although at first blush such results might seem to favor insureds, insurers also benefit under the continuous trigger theory. As the court in *Montrose* noted, the continuous trigger theory is "'the most efficient doctrine [for allocation of liability amongst insurers] for toxic waste cases,'" because "'it encourages all insurers to monitor

66

risks and cha[r]ge appropriate premiums.'" 913 P.2d at 903 n.23, *quoting* Note, *Developments in the Law—Toxic Waste Litigation*, 99 Harv. L. Rev. 1458, 1581 (1986).

¶98 The continuous trigger theory also eliminates "arbitrariness, from the carrier's perspective, of telescoping all damage in a continuing injury case into a single policy period." *Id.* at 903. In other words, elimination of that "arbitrariness" reduces the possibility that insurance providers would ultimately transfer the risk of a trigger theory that renders them wholly liable for injuries occurring during their policy periods to their policyholders through higher premiums. *See id.* Lastly, "choosing [the] . . . trigger theory affording the greatest ultimate redress" gives effect to "the law's solicitousness for victims of mass toxic torts and other environmental contamination." *Winding Hills Condo. Ass'n, Inc. v. N. Am. Specialty Ins. Co.*, 752 A.2d 837, 840 (N.J. Super. Ct. App. Div. 2000); *see also Port Auth. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002); *cf. Owens-Illinois*, 650 A.2d at 985, *quoting Ayers*, 525 A.2d at 314 ("'[M]ass-exposure toxic-tort cases involve public interests not present in conventional tort litigation.'").

¶99 Accordingly, AAU was required to provide coverage under its accident policies if, during the policy period, Intervenors were either exposed to TCE, had TCE-related diseases developing internally as a result of a previous exposure, or manifested fully developed TCE-related diseases. We therefore affirm the trial court's phase I ruling that AAU's policies provided coverage for the injuries suffered by the fourteen trial intervenors.

**III. Reasonableness**

## A. Background

**¶100**       As noted in ¶ 20, *supra*, in early 2002, the trial court (J. Harrington) held an eight-day evidentiary hearing on whether the *Morris* agreement between TAA/City and Intervenors was reasonable in fact and amount. During the hearing, Intervenors argued, inter alia, the agreement was reasonable because of TAA/City's potential exposure to a large jury verdict if the underlying tort cases went to trial. In support of that argument, an attorney who had represented TAA/City in the underlying cases testified that their liability defenses in those cases were, at best, tenuous. Intervenors also adduced expert testimony that, despite the fact that discovery had not been completed on all of them, TAA/City's "'global'" or aggregate settlement with all claimants/Intervenors was the common practice in mass-tort cases. Finally, Intervenors presented expert testimony, again from Legator, that TCE might have caused their alleged injuries. Legator, however, had not personally examined any individual Intervenor or their medical records.

**¶101**       In response, AAU argued the *Morris* agreement was unreasonable because TAA/City had not obtained information on all of the Intervenors and thus had lacked enough information to determine whether an aggregate settlement was appropriate. In addition, AAU presented testimony that TCE could not have caused Intervenors' alleged injuries and, therefore, that TAA/City's *Morris* settlement was unreasonable.

**¶102**       In its April 2002, post-hearing minute entry, the trial court first noted:

> Now that the evidence has been fully presented to the
> Court . . . , it is much clearer how this case was analyzed by

68

the insured, the insurers, the attorneys involved, and others, at the time of the Morris Agreement and in the many months leading up to it. It is clear that the insured analyzed this settlement on a "global" basis. This is not to say, however, that no consideration was given to the claims of individual plaintiffs. One notable example is the claim of plaintiff Barbara Valenzuela. Defense counsel considered her claim to be a pivotal claim. The defendants thought that her claim had as good a chance as any to be dismissed as a matter of law because of lack of the element of causation. The defense attorneys thought [the summary judgment motion as to her claim] could not be lost. When it was, it was a "sobering event." The Barbara Valenzuela case was an "important event" and "changed the mood in the case." It resulted in the parties and their attorneys believing that the plaintiffs in the underlying action would probably survive pretrial motions for summary judgment and would probably survive a request for a directed verdict at the time of trial. The parties realized that if [Barbara Valenzuela's] case would get to the jury then probably the cases in general would also get to the jury. Although many of the attorneys involved thought and hoped that the case was defensible, they realized that issue would be decided by the jury and that if the jury decided the case adversely to the City or TAA that the potential damages were extremely high.

The trial court then adopted and rejected various findings proposed by both sides.

Intervenors' proposed findings of fact, which the trial court adopted, included the following:

The claims alleged by the plaintiffs in the *Valenzuela* and *Gerardo* actions were for serious and substantial personal injuries, wrongful death and loss of consortium. The claims were vigorously prosecuted and defended. Significant discovery was undertaken prior to the settlement. Over 900 plaintiffs had completed written discovery, approximately 400 plaintiffs had been deposed, and hundreds of thousands of pages of documents had been exchanged between the parties at the time of the settlement. Extensive investigations of the relevant fact pattern had been conducted by state and federal

69

governmental agencies as well as by numerous experts retained by the parties.

At the time the *Morris* Agreement was being negotiated, the potential liability for the plaintiffs' claims was estimated by the lawyers representing the TAA and the City of Tucson to be several hundreds of millions of dollars. James Murphy, the reservation of rights counsel for the TAA, described the *Valenzuela* case as a "bet the farm" case. It is clear that the potential liability of both the TAA and the City of Tucson was far in excess of their ability to bond or pay a judgment. . . .

. . . .

At the time the [*Morris*] Agreement was being negotiated, the contribution of Airport sources to the groundwater contamination was hotly contested. Experts hired by the U.S. Environmental Protection Agency, the State of Arizona, Hughes [Aircraft Company], and the plaintiffs had reported that chemical contaminants originating from Airport sources had polluted the drinking water supply in south Tucson. These experts reported that the contaminants alleged to have polluted the drinking water had been released from areas under the direct control of the TAA as well as areas leased by the TAA's tenants. A report commissioned by the E.P.A. estimated that the contribution by Airport sources to the groundwater contamination was 40%. The TAA's and the City's own expert concluded that the Airport's contribution was between 0 and 11%.

. . . .

At the time the *Morris* Agreement was being negotiated, counsel for the TAA and the City reasonably believed that it was more likely than not that the plaintiffs would get their case to a jury. . . .

Given the enormous liability potential faced by the TAA and the City, counsel for the TAA and the City believed that it would be inappropriate to enter into a settlement that did not

70

resolve all of the individual claims that were being asserted in the *Valenzuela* and *Gerardo* actions. During the settlement negotiations, counsel for the TAA and the City never sought settlement of individual claims but instead pursued a global settlement of all claims asserted against their clients by the plaintiffs.

It is common practice in the settlement of a mass tort case to negotiate an overall resolution of the case rather than attempt a claim by claim resolution. Such practice is both reasonable and acceptable.

. . . .

The settlement negotiations between counsel for the plaintiffs and counsel for the TAA and the City that culminated in the *Morris* Agreement were lengthy, conducted at arms length and in good faith. There is no evidence of fraud or collusion on the part of the TAA, the City, or their counsel.

¶103 AAU's proposed findings adopted by the trial court established that "[a]t the time of the *Morris* settlements":  (1) "TAA/City lacked any information about the vast majority of the Intervenors"; (2) "Intervenors' medical experts had not issued their reports as to any Intervenor except Barbara Valenzuela"; (3) "no assessments were ever made of the values of any individual Intervenor's claim"; and (4) "TAA/City never adequately developed [its potential liability] defenses, but settled before such defenses could be fully explored."   The trial court also found the following facts on its own accord:

1.   At the time the Morris Agreement was entered into, discovery had not been completed and it is uncertain as to how many years it would take to complete the discovery as it related to the underlying cases. Although the exact cost for completion of discovery as to these cases and completion of

71

the litigation is unknowable at this point, it is estimated to have cost many millions of dollars.

2. At the time the <u>Morris</u> agreement was entered into, the claims of each potential plaintiff could not be individually evaluated. It is unknown, and perhaps unknowable, when or if each and every individual plaintiff's claim could have been individually evaluated, as a practical matter.

3. There was significant debate up to and including the <u>Morris</u> Agreement in 1989 as to whether TCE could or could not cause the intervenors' claimed injuries. TAA/City were aware of and were provided with information on these issues.

4. At the time of the <u>Morris</u> Agreement, there was additional work to be done, not only by experts, but also by the parties through discovery to address the debate as to whether, and to what extent, any given individual intervenor ingested TCE. However, a significant amount of work had been done at that point in gathering general information about the issues presented in the case.

5. There was significant debate and contradictory evidence as well as additional work to be done by experts and additional discovery by the parties as to the source of the TCE ingested by any given intervenor.

6. Although the total costs of additional work by experts and discovery are unknown, it is estimated to be in the many millions of dollars.

¶104 Based on those findings, the trial court made the following conclusions of law:

The Court finds that a reasonably prudent person in the insured's position would not be required to await completion of discovery in this matter before entering into a <u>Morris</u> Agreement, given the information known by the insured at the time.

The Court further finds that a reasonably prudent person in the insured's position in this matter would not be required to separately evaluate each and every individual claimant and the settlement value . . . for each such individual claimant.

. . . .

At the time the *Morris* Agreement was being negotiated, the information that was available to the TAA and the City was sufficient to permit a reasonably prudent person in the TAA's and the City's position to calculate a reasonable settlement value for the claims asserted by the *Valenzuela* plaintiffs which are at issue here pursuant to Judge Velasco's January 4, 1999 minute entry.

The amounts set forth in the *Morris* Agreement for the claims of the 14 test Intervenors are in the range of amounts that would be agreed upon by a reasonably prudent person in the position of the TAA and the City of Tucson at the time of the settlement.

A reasonably prudent person in the position of the TAA and the City of Tucson at the time of the settlement would have settled on the terms of the *Morris* Agreement that was actually entered into in this case relating to the intervenors at issue here pursuant to Judge Velasco's January 4, 1999 minute entry.

¶105    In September 2002, the trial court issued a second, signed minute entry on the issue of reasonableness entitled, "Judgment for the Fourteen Intervenors Under Consideration in Phase Two." *See* ¶ 21, *supra.* In that judgment, the trial court ruled, inter alia, that the "settlements entered into by the [fourteen trial] Intervenors were reasonable."[30]

---

[30]Notably, in May 2002, the "Non-trial Intervenors" filed a "motion for partial summary judgment on the issue of reasonableness" in which they asked the trial court to apply its findings and conclusions relating to the fourteen "test" intervenors to all of the other Intervenors involved in the case. In a signed minute entry in February 2003, the trial

73

## B. Legal framework

¶106 AAU challenges on several grounds the trial court's determination that the *Morris* agreement was reasonable and prudent in fact and amount. In addressing those challenges, the starting point for our analysis, again, is *Morris*. There, our supreme court stated an agreement between an insured (who is defended under a reservation of rights) and an injured third-party claimant renders an insurer liable only "to the extent that the [insured, or claimant as assignee] establishes that the settlement was reasonable and prudent under all the circumstances." 154 Ariz. at 120, 741 P.2d at 253. If an insured or claimant cannot show that the entire amount of the stipulated judgment was reasonable, he or she may recover only the portion proved reasonable. *Id.* at 121, 741 P.2d at 254; *see also Himes*, 205 Ariz. 31, ¶ 14, 66 P.3d at 80.

¶107 "The test as to whether the settlement was reasonable and prudent is what a reasonably prudent person in the insureds' position would have settled for on the *merits* of

court (J. Harrington), inter alia, granted the motion and expressly adopted its previous findings and conclusions on the *Morris* agreement's reasonableness for "all intervenors who were *not* among the 20 'test' cases that ha[d] been part of the initial phase-two trial in this case." AAU did not appeal from that portion of the February 2003 order and does not specifically challenge the trial court's application of its reasonableness findings and conclusions to the "non-trial intervenors." Indeed, AAU characterizes its position as protesting only the trial court's "approv[al of] more than 1,600 unique, individual claims, and a settlement of thirty-five million dollars." Intervenors, in contrast, only argue that this court should affirm the trial court to the extent it found the *Morris* agreement reasonable as to the fourteen trial Intervenors. Accordingly, because neither Intervenors nor AAU specifically argue for or against the trial court's application of its reasonableness findings and conclusions to all Intervenors, we only address here those findings and conclusions as they pertain to the fourteen trial Intervenors.

74

the claimant's case." *Morris*, 154 Ariz. at 121, 741 P.2d at 254. But, "[t]he indemnitee need not establish . . . that he would have lost the case; he need only establish that given the circumstances affecting liability, defense and coverage, the settlement was reasonable." *Id.* at 120, 741 P.2d at 253. "This involves evaluating the facts bearing on the liability and damage aspects of a claimant's case, as well as the risks of going to trial." *Id.* at 121, 741 P.2d at 254. We must uphold the trial court's factual determinations bearing on reasonableness unless they are clearly erroneous, but we review any legal conclusions de novo. *Enter. Leasing Co. v. Ehmke*, 197 Ariz. 144, ¶ 11, 3 P.3d 1064, 1068 (App. 1999).

**¶108** Both Division One of this court and our supreme court have recently addressed the factors to be considered in determining a *Morris* settlement's reasonableness. *See Parking Concepts*, 207 Ariz. 19, 83 P.3d 19; *Himes*, 205 Ariz. 31, 66 P.3d 74. In *Himes*, Division One stated that the factors to be considered in examining a *Morris* agreement for reasonableness include:

> "[T]he releasing person's damages; the merits of the releasing person's liability theory; the merits of the released person's defense theory; the released person's relative faults [sic]; the risks and expenses of continued litigation [on the merits]; . . . any evidence of bad faith, collusion, or fraud; the extent of the releasing person's investigation and preparation of the case; and the interests of the parties not being released."

205 Ariz. 31, ¶ 33, 66 P.3d at 85, *quoting Chausee v. Md. Cas. Co.*, 803 P.2d 1339, 1343 (Wash. Ct. App. 1991) (alterations in *Himes*).

¶109    According to *Himes*, for *Morris* purposes, "a 'reasonably prudent person' is defined as a person who (1) has the ability to pay a reasonable settlement amount from his or her own funds and (2) makes a settlement decision as though the settlement amount came from those personal funds." 205 Ariz. 31, ¶ 23, 66 P.3d at 82 (footnote omitted). In other words, in order for a settlement to be reasonable, the insured must negotiate a settlement "as though the money that pays the settlement comes from his or her own pocket." *Id.* "Only by applying the [reasonableness] test in this fashion can the lack of arm's-length negotiation inherent in a *Damron*/*Morris* agreement be overcome and replaced with a standard by which an insurer not party to the agreement may be bound." *Id.*

### C. Global settlement

¶110    AAU contends the trial court erred in evaluating the merits of Intervenors' claims on a "global" or aggregate basis because, according to AAU, *Morris* required the trial court to consider the merits of each individual intervenor's tort claims and the amount of damages each intervenor might have been entitled to. In support of its argument, AAU focuses on the *Morris* court's statement that determination of a settlement's reasonableness depends on "what a reasonably prudent person in the insureds' position would have settled

76

for on the *merits* of the claimant's case." 154 Ariz. at 121, 741 P.2d at 254. Essentially, AAU interprets that language to mean that "the *merits* of [each] claimant's case" must be considered in determining reasonableness. *Id.*

¶111 On its face, AAU's position is not entirely untenable. Indeed, we agree that in a straightforward case involving a single plaintiff who alleges injuries arising out of a single, discrete set of facts, determination of a *Morris* agreement's reasonableness would hinge on the legal merits of the plaintiff's liability claims (including causation), the validity of any affirmative defenses the insured might be able to assert, and the nature and extent of the plaintiff's damages. Individualized evidence on all those elements presumably would be presented and considered. Obviously, however, this is not such a case.

¶112 At the outset, we note that AAU's argument is purely legal; it does not directly challenge the trial court's factual finding that, "[a]t the time the Morris agreement was entered into, the claims of each potential plaintiff could not be individually evaluated[, and i]t is unknown, and perhaps unknowable, when or if each and every individual plaintiff's claim could have been individually evaluated, as a practical matter." Nor does AAU contest the trial court's finding that, "[i]t is common practice in the settlement of a mass tort case to negotiate an overall resolution of the case rather than attempt a claim by claim resolution. Such practice is both reasonable and acceptable." Finally, AAU does not challenge the finding that TAA/City in fact had "analyzed this settlement on a 'global' basis."

¶113 In any event, we conclude that AAU's argument is premised on an overly narrow reading of *Morris* and fails to acknowledge that reasonableness is determined by more than only the merits of a claimant's case. Rather, that determination involves consideration of the totality of the circumstances in the underlying litigation. Neither *Morris* nor *Himes* states that the merits of a claimant's case must be given more weight than the other factors bearing on a *Morris* agreement's reasonableness. The legal merits of the claimant's case, albeit important, are but one relevant factor to be considered in evaluating whether an insured's settlement is reasonable and prudent. *See Morris*, 154 Ariz. at 120, 121, 741 P.2d at 253, 254 (insurer is bound if settlement shown to be reasonable and prudent "under *all* the circumstances"; reasonableness depends on "facts bearing on the liability and damage aspects of [the] claimant's case, *as well as the risks of going to trial*") (emphasis added); *see also Himes*, 205 Ariz. 31, ¶ 37, 66 P.3d at 85-86.

¶114 Indeed, under *Morris*, an insured's actual liability need not be established as a prerequisite to finding a *Morris* agreement reasonable. Rather, an insured or claimant need only establish that the potential for the insured to be held liable was such that settlement with the claimant was reasonable. *Morris*, 154 Ariz. at 120, 741 P.2d at 253; *see Trim*, 274 N.W.2d at 37 ("[L]ack of negligence or otherwise[] is but a part of the reasonableness analysis . . . ."); *cf. Munzer v. Feola*, 195 Ariz. 131, ¶¶ 32, 34, 985 P.2d 616, 622 (App. 1999) (although insurer precluded from litigating on remand "the substantive merits" of the underlying case, insurer was free to discover facts relating to the "liability

78

aspect" of malpractice claim). Thus, because the merits of a claimant's case and, in turn, the insured's liability, need not be fully established before a settlement can be deemed reasonable under *Morris*, the more amorphous standard of potential liability is used.

¶115 Here, TAA/City's potential exposure was revealed, albeit to a limited extent, when it lost its motion for summary judgment on Barbara Valenzuela's claims in *Valenzuela*. *See* ¶ 102, *supra*. As the trial court found, because TAA/City had lost that motion, "counsel for the TAA and the City reasonably believed that it was more likely than not that the plaintiffs would get their case to a jury. . . ."[31] In addition, TAA/City was well aware of the disputes on whether TCE could have caused Intervenors' injuries at all and whether Intervenors had ingested TCE for which TAA/City had been responsible. *See* ¶ 103, *supra*.

¶116 As noted above, the trial court found that TAA/City had "lacked any information about the vast majority of the Intervenors," had not made "assessments . . . of the values of any individual Intervenor's claim," and "had not completed [its] investigations regarding [several] significant defenses" at the time the *Morris* agreement was being negotiated. However, the record reflects that TAA/City did consider both the merits of Intervenors' claims to some extent and the substantial risks it faced if it chose to defend and lost at trial. Accordingly, we find no clear error in the trial court's finding that "a reasonably prudent person in [TAA/City's] position . . . would not be required to

---

[31]AAU has not directly challenged that factual finding on appeal.

separately evaluate each and every individual claimant and the settlement value . . . for each individual claimant." For that same reason, the trial court's approval of TAA/City's consideration of Intervenors' claims on a "'global'" or aggregate basis was proper.

### D. Evidence of insurance reserves

¶117 AAU also argues the trial court erroneously admitted, over its relevancy objection, and then improperly considered "AAU internal documents and recommendations" and "status reports which recommended insurance reserves" in making its reasonableness determination. "We will affirm the trial court's rulings on the exclusion or admission of evidence absent an abuse of discretion or legal error and prejudice." *Brown v. U.S. Fid. & Guar. Co.*, 194 Ariz. 85, ¶ 7, 977 P.2d 807, 810 (App. 1998). We find no abuse here.

¶118 Essentially, AAU contends its own internal opinion on the extent of potential liability faced by its insureds is not relevant in determining whether the *Morris* agreement was reasonable. We agree that the amount of money an insurer sets aside as "reserves" in the event a judgment is entered against its insureds is, at best, minimally relevant to the issue of the *Morris* agreement's reasonableness. But, we cannot say this limited evidence prejudiced AAU such that reversal is required. Indeed, in view of the myriad other evidence the trial court considered in determining reasonableness, the trial court clearly would have reached the same result even if it had not admitted the challenged evidence. *Id.* ("The improper admission of evidence is not reversible error if the [trier of fact] would have reached the same verdict without the evidence.").

80

### E. Specific dollar amount

¶119     Lastly, AAU argues the trial court erred in failing to assign a specific dollar amount for any individual claim. In doing so, AAU contends, the trial court violated the following principle recognized in *Himes*: "[T]he trial judge is required to . . . determine, based on the evidence presented at the hearing, to what extent the settlement is reasonable. This requires the finder of fact to determine a specific dollar amount as reasonable as it is an amount, not a range, that will be enforced." 205 Ariz. 31, ¶ 22, 66 P.3d at 81; *see also Waddell*, 207 Ariz. 529, ¶ 17, 88 P.3d at 1146. Although we agree with *Himes* on that point, we disagree with AAU's claim of error.

¶120     AAU correctly notes that, in finding the agreement reasonable, the trial court concluded that "[t]he amounts set forth in the *Morris* Agreement . . . are *in the range* of amounts that would be agreed upon by a reasonably prudent person in the position of the TAA and the City of Tucson at the time of the settlement." (Emphasis added.) Had the trial court based its ultimate ruling on that statement, the reasonableness determination would have been flawed. But, the trial court went on to rule that "[a] reasonably prudent person in the position of the TAA and the City of Tucson at the time of the settlement would have settled on the terms of the *Morris* Agreement *that was actually entered into in this case*." (Emphasis added.) Accordingly, unlike the situation in *Himes*, the trial court did not merely approve of the settlement amount as within the range of a reasonable settlement; rather, after considering all the evidence and the Intervenors' burden of proof, the trial court

approved of the precise settlement amount TAA/City and Intervenors had agreed to in the *Morris* agreement. That ruling is consistent with the mandates of both *Morris* and *Himes*.

### F.  Other issues

**¶121**        Relying largely on *Himes*, AAU also contends that, in determining reasonableness, the trial court improperly considered TAA/City's potential defense costs and the potentially catastrophic financial effect a jury verdict in favor of Intervenors might have had on TAA/City. *See* 205 Ariz. 31, ¶ 35, 66 P.3d at 85 (because "*inability* to pay (or the potentially devastating impact of a large money judgment on a defendant) is not an admissible fact in determining the merits of the [underlying] action," that is "not an appropriate factor to consider in determining reasonableness under a *Damron*/*Morris* agreement"). We do not address these issues, however, because AAU failed to object below to the admission of such evidence during the phase II trial.[32] *See*

---

[32]Moreover, an insured's ability to pay an adverse judgment, though not relevant to the merits of the underlying case, arguably is relevant on the issue of reasonableness of an insured's ultimate decision to settle with a claimant. In our view, AAU's argument overlooks *Morris*'s directive that determining what a reasonably prudent person would have settled for on the merits of the claimant's case "involves evaluating the facts bearing on the liability and damage aspects of [the] claimant's case, *as well as the risks of going to trial.*" *Morris*, 154 Ariz. at 121, 741 P.2d at 254 (emphasis added); *cf. Parking Concepts*, 207 Ariz. 19, ¶ 26, 83 P.3d at 24 (a court reviewing a *Morris* settlement for reasonableness "should apply the same criteria that must be applied by the insurer under its implied contractual covenant of good faith and fair dealing in evaluating a settlement proposal in the absence of a reservation of rights[;]" and such duty requires the insurer (and, therefore, the insured acting as surrogate for the insurer) "to consider, even when the merits of the claimant's case are fairly debatable, the financial risk that an adverse judgment in excess of policy limits may have on the insured"). Thus, ability to pay, or the financial consequences of, an adverse judgment arguably is a "risk[] of going to trial" and, therefore,

*Crowe v. Hickman's Egg Ranch, Inc.*, 202 Ariz. 113, ¶ 16, 41 P.3d 651, 654 (App. 2002) ("Issues not properly raised below are waived."). For all of the foregoing reasons, we affirm the trial court's judgment on the issue of reasonableness.

## CROSS-APPEAL

### I. AAU's occurrence policy and Intervenor Montejano

**¶122** Intervenor Yvonne Montejano appeals from the March 2003 judgment entered against her on the basis that she was exposed to TCE only during the period of AAU's occurrence policy, August 1, 1969, through October 1, 1972. The trial court (J. Velasco) previously concluded that "[n]o insured event happened during the period of the occurrence AAU policy." As noted above, *see* ¶ 8, *supra*, the occurrence policy contained language identical to the accident policy except that instead of insuring against injuries "caused by accident," it covered injuries "caused by an occurrence." The policy defined "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." The trial court did not explain why "[t]he events do not come within the definition of the terms of the 'occurrence' based policies," the only basis cited for the "directed verdict" in AAU's favor relating to those policies.

a legitimate factor for an insured to consider in deciding whether to settle. *Morris*, 154 Ariz. at 121, 741 P.2d at 254; *see also Trim*, 274 N.W.2d at 37 (reasonableness depends on "the amount paid in settlement of the claim in light of the risk of exposure").

¶123    We see no reason why coverage should exist under AAU's accident policies but not under its occurrence policy.  By its own terms, the latter policy defines "occurrence" as encompassing "an accident."  And, the occurrence policy specifically refers to this type of case by providing that an occurrence can be the "continuous or repeated exposure to conditions" that results in bodily injury.  The cases we discussed above on the topic of whether or when insurance coverage is triggered in a mass-tort context typically dealt with occurrence policies similar to AAU's. *See Forty-Eight Insulations*, 633 F.2d at 1216 n.7 (because choice of trigger theory "center[ed] on interpretation of the term 'bodily injury,'" no party "ascribe[d] any significance" to 1966 change from "accident" to "occurrence" policy).  Therefore, our analysis of the trigger issue applies with equal, if not greater, force to AAU's occurrence policy.  Because AAU does not dispute that Yvonne Montejano was first exposed to TCE during the occurrence policy period, she suffered sufficient bodily injury to trigger insurance coverage under that policy.  Accordingly, the trial court's March 2003 judgment as to Yvonne Montejano is reversed.

## II.  Intervenors Lopez and Estes

¶124    Intervenor Edward Lopez appeals from the March 2003 summary judgment entered against him. As noted above, *see* ¶ 64, *supra*, the trial court's basis for entering judgment against Edward Lopez was that Lopez claimed to have been exposed to TCE while living outside the area impacted by TAA/City's TCE contamination. As with Peter Paul Lopez, however, the alleged flaw in Edward Lopez's claim is one of causation. That is, AAU claims judgment was properly entered against him because he had not been exposed to TCE for which TAA/City was responsible, if at all. Under *Morris*, however, AAU is precluded from challenging that point. Therefore, because AAU raises no other grounds for defeating Edward Lopez's claim, the trial court erred in entering judgment against him.

¶125    We must also reverse the trial court's entry of summary judgment against intervenor Frances Estes. Before the phase I trial and subsequent ruling, the trial court entered judgment against her because she alleged she had been exposed to TCE before AAU's accident policy took effect. Under the continuous trigger theory, however, that Estes was exposed before the policy period—a fact AAU does not challenge—means she suffered "bodily injury" during the policy period in the form of exposure-in-residence. Such injury was sufficient to trigger coverage under AAU's accident policy, and the trial court erred in entering summary judgment against her.

## III. Intervenors' request for money judgment

## A. Procedural background

¶126     After the trial court entered its April 2002 ruling in favor of Intervenors on the issue of reasonableness, Intervenors filed a proposed form of judgment that included a monetary award for the fourteen trial intervenors. AAU objected to the proposed judgment, arguing that a monetary award is not available in a DRA and that a third-party claimant may collect from an insurer only through a garnishment action. AAU further argued any attempts to institute a garnishment action at that point would be futile because, according to AAU, the underlying *Gerardo* judgments had expired and, therefore, there was no basis for a garnishment action.

¶127     As noted earlier, in September 2002, the trial court issued its "Judgment For the Fourteen Intervenors Under Consideration in Phase Two." At that same time, the court ruled on AAU's objection to Intervenors' proposed judgment, stating: "the issues in this declaratory relief action primarily involve issues of coverage and reasonableness of the Morris agreements. Accordingly, the Court **SUSTAINS** the objections asserted by AAU" to Intervenors' proposed judgment. But the trial court further noted:

> In sustaining the objections . . . the Court makes no ruling whatsoever as to the validity or invalidity of any judgments in favor of Intervenors in any other matter, including, but not limited to, whether or not the Judgments in favor of Intervenors in any other matter are expired or unenforceable; whether there is an underlying debt or obligation in favor of Intervenors to enforce; whether or not laches, estoppel, or any other defense in any action on the Judgment, garnishment action or similar action with respect to the underlying Judgments in related cases are available to the parties in this case.

86

Notwithstanding its refusal to sign Intervenors' proposed judgment and award them monetary relief, the trial court ordered in its final judgment "that post-judgment interest on the amounts owed by [AAU] to Intervenors shall accrue at the legal rate of interest on judgments from the date of the entry of this Judgment until paid."

¶128 Intervenors then filed several post-judgment motions. First, Intervenors requested that a money judgment be entered in their favor as a form of supplemental relief under A.R.S. § 12-1838. In that motion, Intervenors stated that "[t]he relief requested by Intervenors flows directly from the Court's September 23, 2002 Declaratory Judgment." Because that judgment was clearly limited to only the fourteen trial intervenors, Intervenors' motion apparently requested a monetary award only in favor of those particular individuals, although that is not entirely clear. Intervenors' motion was also unclear on whether they wanted the trial court to base any monetary award, and interest thereon, on the *Gerardo* judgment, or rather, on the *Morris* agreement alone. For example, Intervenors stated they were "entitled to recover the amount of their judgment from AAU." Later in the motion, however, Intervenors claimed that whether the *Gerardo* judgment had expired was "irrelevant" and, essentially, that any monetary award could be based on the settlement amounts stated in the *Morris* agreement alone. That distinction is relevant insofar as TAA/City and Intervenors apparently executed the *Morris* agreement in June 1989, but judgment was not entered thereon until April 1991.

¶129　　　　Second, Intervenors moved to amend their complaint-in-intervention retroactively to include an application for a writ of garnishment. That proposed application, in contrast to their motion for supplemental relief, clearly sought to garnish AAU for the entire amount of the *Gerardo* judgment and all interest accrued thereon. The total amount Intervenors requested in their proposed writ of garnishment was over $75 million.

¶130　　　　Third, Intervenors moved to amend the September 2002 judgment to include monetary relief if the trial court granted either of the two foregoing motions. Notably, Intervenors requested monetary relief in that motion only for the fourteen trial intervenors. While those motions were pending, however, this case was reassigned to Judge Cornelio after Judge Harrington was transferred to a different division of the court.

¶131　　　　In a January 2003 minute entry, the trial court (J. Cornelio) denied all of Intervenors' motions. On Intervenors' motion for supplemental relief, the trial court found that, although money damages might be awarded as part of a DRA "in the appropriate case," this case presented the "more narrow" question of "whether the Intervenors have a direct action against AAU." In answering that question, the trial court agreed with AAU that its "requirement to pay arises out of [its] indemnity contract with the insured; and it is the money judgment, entered against the insured, that creates the financial obligation. This is collected upon by garnishment." The trial court also denied Intervenors' motion to amend their complaint to include a garnishment application. Intervenors have not challenged that ruling in their cross-appeal.

¶132 In denying Intervenors' motions, the trial court acknowledged it was not addressing "the issue of concern to both Intervenors and AAU," "[t]hat is, whether Intervenors may, ultimately, collect on the *Morris* Agreement and *Gerardo* Judgment." Indeed, the court specifically noted it had neither "addressed nor made a determination of whether the expiration of the *Gerardo* Judgment has been tolled during the period of this litigation . . . [or] whether the Complaint in Intervention for Declaratory Judgment can serve as a renewal by action pursuant to A.R.S. § 12-1611."

¶133 Intervenors moved the court to reconsider its denial of their motions and essentially reurged their previous arguments. The trial court denied that motion as well, stating:

> The court has reviewed the case file and pleadings and believes that Judge Harrington previously addressed and ruled on the issue and rejected arguments by the Intervenor[s] that this declaratory action can result in a financial judgment against Associated Aviation Underwriters. The court does not find manifest error in Judge Harrington's ruling.

¶134 Intervenors have cross-appealed from the denial of their requests for monetary relief. Intervenors ask this court to "reverse the judgment of September 23, 2002, and remand to the trial court with instructions to amend the judgment to include monetary relief on behalf of the 14 Intervenors who are Cross-Appellants from that judgment."

¶135 As they did below, Intervenors assert that, under § 12-1838, a trial court may award money damages as a form of supplemental relief in a DRA. Further, because they apparently concede that "the *Gerardo* judgments provide the sole basis" for their request

89

for monetary relief, Intervenors also argue that those judgments have not expired.  In addition, Intervenors maintain that their request for a monetary award does not turn this case into an impermissible "direct action" by a tort claimant against a tortfeasor's insurer.  *See Nationwide Mut. Ins. Co. v. Arizona Health Care Cost Containment Sys.*, 166 Ariz. 514, 517, 803 P.2d 925, 928 (App. 1990).  We address each of these arguments in turn.

## B. Availability of supplemental relief

¶136    Section 12-1838 provides that

> [f]urther relief based on a declaratory judgment or decree may be granted whenever necessary or proper.  The application therefor shall be by complaint or appropriate pleading to a court having jurisdiction to grant the relief.  If the application be deemed sufficient, the court shall, on reasonable notice, require any adverse party whose rights have been adjudicated by the declaratory judgment or decree, to show cause why further relief should not be granted forthwith.

We review de novo the trial court's legal conclusions on § 12-1838's applicability and interpretation.  *See Norgord v. State ex rel. Berning*, 201 Ariz. 228, ¶ 4, 33 P.3d 1166, 1168 (App. 2001).  The law is clear, and AAU does not directly argue otherwise, that supplemental relief statutes such as § 12-1838 allow courts to grant monetary relief in a DRA.  *See Trico Elec. Coop. v. Ralston*, 67 Ariz. 358, 365, 196 P.2d 470, 474 (1948) ("It is proper to ask for and receive injunctive or other relief [in a DRA] where the facts warrant it."); *Podol v. Jacobs*, 65 Ariz. 50, 55, 173 P.2d 758, 761 (1946) ("It . . . seems to be the rule that consequential or incidental relief, if properly alleged and sought, may be granted

in a declaratory judgment proceeding."); *Chace v. Dorcy Int'l, Inc.*, 587 N.E.2d 442, 451-52 (Ohio Ct. App. 1991) (trial court did not err in entering money judgment for indemnification in favor of insured in declaratory relief action against insurer).[33]

**¶137** On several grounds, however, AAU does argue that Intervenors cannot receive a money judgment in this case. AAU first contends Intervenors' complaint-in-intervention in this action is not a "complaint or appropriate pleading" for purposes of § 12-1838 and, therefore, even if Intervenors otherwise could receive supplemental relief, their application for such relief is fatally flawed. As AAU correctly points out, when Intervenors filed their complaint-in-intervention, the *Gerardo* judgments had not yet been entered. Therefore, AAU argues, Intervenors' request in that complaint for a monetary award fails because it is not "based on a declaratory judgment or decree." § 12-1838.

**¶138** AAU's argument is misplaced, however, because the "declaratory judgment or decree" on which Intervenors' request for further relief was based was the judgment ultimately entered in this DRA, not in the underlying *Gerardo* litigation. Indeed, Intervenors' complaint-in-intervention clearly requested a ruling in this case "[t]hat AAU

---

[33]*See also Hudson v. Hardy*, 424 F.2d 854, 855 (D.C. Cir. 1970); *United Services Auto. Assoc. v. Pons*, 383 So. 2d 166, 169 (Ala. Ct. App. 1979); *Sullivan v. Local Union 1726*, 464 A.2d 899, 903 (Del. 1983); *Hill v. Palm Beach Polo, Inc.*, 805 So. 2d 1014, 1016 (Fla. Ct. App. 2001); *Stein, Hinkle, Dawe & Assoc., Inc. v. Cont'l Cas. Co.*, 313 N.W.2d 299, 306 (Mich. Ct. App. 1981); *Satterfield v. Layton*, 669 S.W.2d 287, 289 (Mo. Ct. App. 1984); *Standard Fed. Sav. Bank v. State Farm Fire & Cas. Co.*, 537 N.W.2d 333, 336 (Neb. 1995); *Capital Props., Inc. v. State*, 749 A.2d 1069, 1080 (R.I. 1999); *Torbett v. Wheeling Dollar Sav. & Trust Co.*, 314 S.E.2d 166, 170-71 (W. Va. 1983).

is obligated, under each policy at issue here, to fund the [Intervenors'] settlement" and that Intervenors "be awarded such other and further relief as the Court may deem just and proper." Although Intervenors did not cite § 12-1838 in the complaint-in-intervention, their prayer for relief was clear enough to give AAU notice that Intervenors were seeking monetary relief in this action. That Intervenors moved to intervene in this case and requested monetary relief before the *Gerardo* judgments had been entered is relevant to the question of whether this action renewed those judgments. *See* ¶¶ 144-54, *infra.* But that chronological sequence bears little on the technical sufficiency of Intervenors' request for supplemental relief in this action.

¶139 Moreover, AAU cannot seriously argue that, for the first eleven years it litigated this action in the trial court, it believed Intervenors were merely seeking a declaration of rights. In short, we conclude Intervenors' complaint-in-intervention sufficiently requested supplemental relief for purposes of § 12-1838. *See Keggi*, 199 Ariz. 43, ¶ 10, 13 P.3d at 787 ("The declaratory judgments act is interpreted liberally."); A.R.S. § 1-211(B) ("Statutes shall be liberally construed to effect their objects and to promote justice."); Ariz. R. Civ. P. 1, 16 A.R.S., Pt. 1 (civil procedure rules "construed to secure the just, speedy, and inexpensive determination of every action").

¶140 Even if Intervenors' complaint-in-intervention did not adequately request monetary relief under § 12-1838, their later, post-trial motion for supplemental relief was a valid application for a monetary award under the statute. AAU asserts, however, that

92

latter motion was not an "appropriate pleading" under § 12-1838 because Rule 7, Ariz. R. Civ. P., 16 A.R.S., Pt. 1, defines "[p]leadings" as only complaints, answers, and replies. *See Mallamo v. Hartman*, 70 Ariz. 294, 297, 219 P.2d 1039, 1041, *as modified on other grounds*, 70 Ariz. 420, 222 P.2d 797 (1950) ("A motion is not a pleading under the Federal Rules of Procedure adopted by this court."). We disagree because, in our view, "pleading," as used in § 12-1838, is broader than that term as used in Rule 7, Ariz. R. Civ. P. *Cf.* Daniel J. McAuliffe, *Arizona Civil Rules Handbook*, at 94 (2004) (noting that Rule 7 merely "abolishes the technical forms" of pleading such as demurrers, pleas, and exceptions, since those "common law technical forms have been replaced by motion practice").

¶141     In construing statutes, "courts should give meaning to all the language used in a statute and avoid an interpretation that renders a term either duplicative or meaningless." *Phoenix Newspapers, Inc. v. Superior Court*, 180 Ariz. 159, 162, 882 P.2d 1285, 1288 (App. 1993). Because Rule 7 defines "pleading" to encompass a complaint, to similarly construe "pleading" as that term is used in § 12-1838 would render the word "complaint" in that statute superfluous. Such a construction would negate the legislature's clear intent to allow one to apply for supplemental relief in a complaint "or" some other "appropriate" form. Thus, even if Intervenors' complaint-in-intervention did not qualify as a "complaint or appropriate pleading" under § 12-1838, Intervenors' motion for supplemental relief did.

93

¶142    In sum, therefore, a trial court may award supplemental relief in the form of a money judgment in a DRA such as this, pursuant to § 12-1838. And, through both their complaint-in-intervention and their post-trial motion, Intervenors sufficiently applied for such relief in the trial court. As AAU suggests, however, whether Intervenors are entitled to a monetary award in this action turns on the more difficult question of whether the underlying *Gerardo* judgments have expired. AAU contends those judgments have lapsed and, without them, Intervenors' request for supplemental relief in this action necessarily fails.

¶143    We agree with AAU that whether or not the *Gerardo* judgments have expired is pivotal to Intervenors' request for a monetary award. Those judgments established TAA/City's liability to Intervenors. If collection on that liability is now barred because the *Gerardo* judgments have expired by operation of law, AAU would have no resulting indemnity obligation for that liability. In other words, if the *Gerardo* judgments entered against TAA/City have expired, TAA/City has no liability obligation to Intervenors and AAU is not required to indemnify TAA/City. In that scenario, as a matter of law, Intervenors would not be entitled to supplemental relief in the form of a monetary award from AAU. Under § 12-1838, awarding Intervenors "[f]urther relief" against AAU would not be "proper" if no underlying tort liability exists on which AAU's indemnity obligation

94

can be based.[34]  As noted above, *see* ¶ 135, *supra*, Intervenors apparently concede as much by stating that the *Gerardo* judgments provide the "sole basis" for their request for monetary relief.  Accordingly, we next address whether the *Gerardo* judgments have expired.

## C.  Continued validity of *Gerardo* judgment

¶144        Section 12-1551, A.R.S., provides:

> A. The party in whose favor a judgment is given, at any time within five years after entry of the judgment and within five years after any renewal of the judgment either by affidavit or by an action brought on it, may have a writ of execution or other process issued for its enforcement.
>
> B. An execution or other process shall not be issued upon a judgment after the expiration of five years from the date of its entry unless the judgment is renewed by affidavit or process pursuant to section 12-1612 or an action is brought on it within five years from the date of the entry of the judgment or of its renewal.

Intervenors concede that they failed to renew the *Gerardo* judgments by affidavit pursuant to A.R.S. § 12-1612 but nonetheless contend those judgments have not expired under § 12-1551.

¶145        Intervenors argue, inter alia, that "even if the clock did begin to tick on [the *Gerardo*] judgment[] pursuant to A.R.S. § 12-1551, [they] have renewed their judgments by pursuing this case, which is an action on those judgments pursuant to A.R.S. § 12-

---

[34]We do not address or purport to rule on whether a valid, underlying legal obligation must exist in every case in order for a court to award supplemental relief under § 12-1838.

1611."[35] Section 12-1611 states: "A judgment may be renewed by action thereon at any time within five years after the date of judgment." According to Intervenors, an "'action on the judgment' [i]s any action that seeks to test the enforceability of [a] judgment against the judgment debtor or a third party."

¶146    In response, AAU first argues this action cannot constitute an action on the *Gerardo* judgments because Intervenors filed their complaint-in-intervention herein almost two years before the *Gerardo* judgments were entered. Second, AAU maintains an action on a judgment must be an action against the same defendant against whom the judgment sought to be enforced had been entered.

¶147    We cannot accept AAU's first argument because it rests on a mere fortuity over which Intervenors had no control: AAU's filing of this DRA. Instead, we analogize Intervenors' filing of their complaint-in-intervention in this DRA before the *Gerardo* judgments had been entered to the filing of a notice of appeal before final judgment is entered. In the case of such a "[p]remature appeal," the notice of appeal "simply takes effect when the clerk of the court enters the final judgment." *Performance Funding, LLC v. Barcon Corp.*, 197 Ariz. 286, ¶ 5, 3 P.3d 1206, 1208 (App. 2000). "Arizona courts

---

[35]Intervenors alternatively argue that the five-year limitations period in § 12-1551 was tolled until the *Gerardo* judgments were "suable" and, at the earliest, only began to run when the trial court in this action found coverage and the *Morris* agreement reasonable. Intervenors further contend the *Morris* agreement's covenant not to execute on the judgments against TAA/City prevented Intervenors from seeking to directly enforce those judgments against AAU pursuant to TAA/City's assignment of its indemnity rights. We reject those arguments, and the authorities Intervenors cite in support of them are inapposite.

disfavor hypertechnical arguments," and instead prefer to dispose of cases on their merits. *Guinn v. Schweitzer*, 190 Ariz. 116, 119, 945 P.2d 837, 840 (App. 1997); *see also Gust, Rosenfeld & Henderson v. Prudential Ins. Co.*, 182 Ariz. 586, 590, 898 P.2d 964, 968 (1995) ("The defense of statute of limitations is never favored by the courts.").

¶148 TAA/City's and Intervenors' *Morris* agreement preceded the complaint-in-intervention and clearly was contingent upon a final judgment being entered on it. *See Waddell*, 207 Ariz. 529, ¶ 20, 88 P.3d 1141, 1146. We conclude that, under the circumstances, Intervenors were not required to wait until the *Gerardo* judgments had been entered before intervening and asserting their third-party claims in this action. To rule otherwise would elevate form over substance, which the law seeks to avoid. *See Bryan v. Riddel*, 178 Ariz. 472, 477, 875 P.2d 131, 136 (1994); *Washburn v. Pima County*, 206 Ariz. 571, 81 P.3d 1030 (App. 2003); *cf. Yank v. Juhrend*, 151 Ariz. 587, 590, 729 P.2d 941, 944 (App. 1986) ("A forfeiture is generally abhorred by the law.").

¶149 That the entry of judgment need not precede commencement of the third-party action, however, does not resolve the second point AAU raises—whether Intervenors' complaint-in-intervention constitutes an action on the *Gerardo* judgments and therefore renews them pursuant to § 12-1611. Rather, the answer to that question depends on whether a judgment creditor such as Intervenors can bring an action on a judgment only against the same party against whom judgment originally was entered. More specifically, whether Intervenors' complaint-in-intervention in this DRA can be construed as an action on the

97

*Gerardo* judgments, thereby renewing them pursuant to § 12-1611, turns on the question of whether an action brought against an insurer can constitute an action seeking enforcement of a judgment entered against one of its insureds. The parties have not cited, nor have we found, any Arizona case that answers this question and, therefore, we turn to out-of-state authority for guidance.

**¶150**      "Every judgment gives rise to a common law cause of action to enforce it, called an action upon a judgment." *Burshan v. Nat'l Union Fire Ins. Co.*, 805 So. 2d 835, 840-41 (Fla. Dist. Ct. App. 2001). "The 'main purpose of an action on a judgment is to obtain a new judgment which will facilitate the ultimate goal of securing the satisfaction of the original cause of action.'" *Id.* at 841, *quoting Adams v. Adams*, 691 So. 2d 10, 11 (Fla. Dist. Ct. App. 1997). Generally, an action on a judgment can only be brought against the defendant of record in the judgment and not against an entity or person not named in the original judgment. *Peterson v. Superior Bank FSB*, 611 N.E.2d 1139, 1141 (Ill. App. Ct. 1993); *see also* 47 Am. Jur. 2d *Judgments* § 990 (1995). But that general rule has some exceptions. For instance, an action against a judgment debtor's successor-in-interest is an action on the judgment. *Peterson*, 611 N.E.2d at 1141. And, some courts have held that an action against a corporation's sole shareholder or alter ego is an action on a judgment previously obtained against the corporation itself. *See Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 142-43 (2d Cir. 1991); *Turner Murphy Co. v. Specialty Constructors, Inc.*, 659 So. 2d 1242, 1245-46 (Fla. Dist. Ct. App. 1995).

¶151	The reasoning behind the general rule that actions on judgments cannot be brought against individuals or entities not parties to the original judgment is obvious: "It is a violation of due process for a judgment to be binding on [and enforceable against] a litigant who was not a party or a privy, and therefore has never had an opportunity to be heard." *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 327 n.7, 99 S. Ct. 645, 649 n.7, 58 L. Ed. 2d 552, 559 n.7 (1979); *see Cravens, Dargan & Co. v. Superior Court*, 153 Ariz. 474, 476, 737 P.2d 1373, 1375 (1987). Thus, at its core, the question of whether Intervenors' complaint-in-intervention in this DRA can be construed as an action upon the *Gerardo* judgments depends on the extent to which AAU was bound by those judgments. *See Peterson*, 611 N.E.2d at 1141 (joint-venturers not bound by arbitration award entered against co-joint venturer "unless consent had been given or unless their conduct ratified the contract").

¶152	The *Morris* agreement and consent judgments entered thereon bound AAU to the extent its interests did not conflict with those of TAA/City and to the extent the agreement was reasonable in fact and amount. For all the reasons stated above, *see* ¶¶ 42-47, *supra*, application of collateral estoppel to bind AAU on issues not directly affecting coverage did not violate AAU's due process rights. And, as to its due process rights on the remaining coverage issues and, in turn, its indemnity liability for the *Gerardo* judgments, AAU was able to and did fully litigate those issues in the trial court. Because AAU was thus obligated to indemnify TAA/City (by paying Intervenors as their assignees) for the

*Gerardo* judgments, we conclude that Intervenors' claim against AAU for indemnification as stated in their complaint-in-intervention here was an action on the *Gerardo* judgments.

¶153 That TAA/City assigned to Intervenors its right to indemnification from AAU also supports our conclusion. When a judgment is entered against an insured, the insured has the right to seek indemnification from the insurer, assuming the basis for liability is covered by the policy. In this case, when TAA/City assigned its indemnity rights to Intervenors, they merely stepped into TAA/City's shoes and assumed the burden of establishing coverage and AAU's indemnity obligation. *See K.B. v. State Farm Fire & Cas. Co.*, 189 Ariz. 263, 267, 941 P.2d 1288, 1292 (App. 1997) ("An assignee steps into the shoes of her assignor."). Notably, before Intervenors intervened in this case, TAA/City had brought counterclaims against AAU for essentially the same relief Intervenors ultimately requested in their complaint-in-intervention. Thus, both TAA/City and Intervenors sought to prove in this case that AAU was, in fact, the judgment debtor in the underlying tort action. Intervenors met that burden by proving that coverage existed under AAU's policy and that their settlements with TAA/City were reasonable in fact and amount.

¶154 In sum, by intervening and pursuing their interests in this action, Intervenors renewed the *Gerardo* judgments pursuant to § 12-1611. Because those judgments have not expired, TAA/City's underlying tort liability still exists and forms the basis for AAU's indemnity obligation. And, because the *Gerardo* judgments have not expired, Intervenors' right to seek indemnity from AAU also still exists, pursuant to TAA/City's assignment of

100

its rights under the policies. Moreover, that AAU has an outstanding indemnity obligation under its policies thus renders an award of further relief in the form of a money judgment pursuant to § 12-1838 both "necessary and proper." Although the trial court (J. Cornelio or J. Harrington) did not decide whether the *Gerardo* judgments had expired in denying Intervenors' post-judgment motions, based on the foregoing analysis, we conclude that the court erred in failing to award relief under § 12-1838.

### D. Other considerations

¶155 We next address whether an award of monetary relief to Intervenors transforms this case into an impermissible direct action by an injured, third-party claimant against a tortfeasor's insurer. The "general rule" is that "in the absence of a contractual or statutory provision to the contrary, an injured person has no direct cause of action against a tortfeasor's insurance company." *Nationwide*, 166 Ariz. at 517, 803 P.2d at 928. The trial court (J. Cornelio) apparently followed that general rule by denying Intervenors' motion for supplemental relief. But, in doing so, the court overlooked TAA/City's assignment to Intervenors of its right to receive indemnity from AAU. When there has been such an assignment, and a judgment has been rendered against an insured tortfeasor, an injured claimant may bring a direct action against the tortfeasor's insurer. *See Gen. Accident Fire & Life Assurance Corp. v. Little*, 103 Ariz. 435, 438, 443 P.2d 690, 693 (1968) ("It has long been the law in Arizona, and the law in most if not all jurisdictions that an assignee of a chose in action may maintain suit thereon in his own name."); *Ring v. State Farm Mut.*

*Auto. Ins. Co.*, 147 Ariz. 32, 35, 708 P.2d 457, 460 (App. 1985) (Arizona is "in line with the vast majority of courts" in allowing an assignee of an insured's rights to proceed directly against an insurer); *see also* Lee R. Russ, *Couch on Insurance* § 104:4 (3d ed. 1997). AAU does not argue that the policies issued to TAA/City prohibited such assignment. And, Arizona law clearly does not prohibit such assignments.

¶156 Nonetheless, AAU contends the assignment of rights here does not permit Intervenors to bring this action because, at the time the assignment was made, AAU had not breached the insurance contract. But AAU provides no authority for the proposition that an insurer must breach an insurance contract in order for an assignment of rights under that contract by an insured to an injured claimant to be valid. Indeed, *Morris* itself acknowledged that by reserving its rights to contest coverage, the insurer in that case did not breach any of its policy obligations. 154 Ariz. at 118, 741 P.2d at 251. And yet, in *Morris*, the assignment of rights by the insureds to the plaintiff John Morris was clearly valid. In short, awarding Intervenors a monetary award pursuant to § 12-1838 does not turn this case into an impermissible direct action.

¶157 Although we have concluded that Intervenors are entitled to supplemental relief, we are nonetheless required to remand the case for a determination of the specific damage awards to which the fourteen trial intervenors are entitled. Under § 12-1838, "[i]f the application [for supplemental relief] be deemed sufficient, the court shall, on reasonable notice, require any adverse party whose rights have been adjudicated by the declaratory

102

judgment or decree, to show cause why further relief should not be granted forthwith." *But see State ex rel. Bardacke v. New Mexico Fed. Sav. & Loan Ass'n*, 699 P.2d 604, 606 (N.M. 1985) (finding that supplemental relief statute similar to Arizona's and order to show cause provision therein "does not apply . . . where the non-declaratory relief is requested in the original complaint together with declaratory relief"). As AAU points out, Intervenors' proposed judgment that included monetary awards for the fourteen trial intervenors referred to other awards those individuals apparently had received from "prior settlements" with insurers not parties to this appeal. Because, to our knowledge, no evidence was presented below on the basis for those other awards or whether the amounts alleged by Intervenors were actually received, the case must be remanded for a hearing in which AAU will be entitled to show cause why further relief in the amounts the fourteen trial intervenors requested in their proposed form of judgment should not be granted.

## DISPOSITION

¶158 The trial court's September 2000 ruling (as reduced to judgment in September 2002) that AAU's accident policies provided coverage for the claims of the fourteen trial intervenors is affirmed. That portion of the judgment in which the trial court found that AAU's occurrence policy did not provide coverage is reversed, as is the judgment entered against Yvonne Montejano on that ground. The trial court's September 2002 judgment finding that the *Morris* agreement and consent judgment were reasonable in fact and amount is affirmed. The March 2003 summary judgments entered against Edward Lopez and

103

Frances Estes are reversed.  The trial court's denial of Intervenors' motion for supplemental relief is reversed.  But, we remand the case to provide AAU an opportunity to show cause why relief in the amounts requested by the fourteen trial intervenors should not be granted.  In our discretion, we deny AAU's request for attorney fees made pursuant to A.R.S. § 12-341.01(A).

_____
JOHN PELANDER, Chief Judge

CONCURRING:

_____
PHILIP G. ESPINOSA, Judge

_____
PETER J. ECKERSTROM, Judge